1  Martin A. Bihn (014338)
2  Donna M. McDaniel (017366)
   **BIHN & MCDANIEL, PLC**
3  2600 N. Central Avenue, Suite 1775
4  Phoenix, Arizona 85004
   (602) 248-9779
5  (602) 248-9749 (fax)
6  *Attorney for Plaintiffs*

7  Scott H. Zwillinger (019645)
8  Scott A. Griffiths (028906)
   David P. Uffens (031188)
9  **GOLDMAN & ZWILLINGER PLLC**
10 7047 E. Greenway Parkway, Suite 150
   Scottsdale, Arizona 85254
11 (480) 626-8483
12 (480) 383-6224 (Fax)
   E-mail:  docket@gzlawoffice.com
13 *Attorneys for Plaintiffs except Schuster*

14                **IN THE UNITED STATES DISTRICT COURT**

15                    **FOR THE DISTRICT OF ARIZONA**
16

17 | Christopher Russett, a married man; David | Case No.: 2:16-cv-00431-ROS |
18 | Holder, a single man; Desiree Knigton, a |  |
   | single woman; Doug Schuster, a single |  |
19 | man; Tim Baca, a married man; Armando | **FIRST AMENDED COMPLAINT AND** |
20 | Salazar, a married man; and Susette and | **DEMAND FOR JURY TRIAL** |
   | David Kohler, a married couple; Ricardo |  |
21 | Acosta, a married man, Eduardo Osuna, a |  |
22 | single man, |  |

23                Plaintiffs,

24 v.

25

26

27 State Of Arizona, a governmental entity;
   Charles Ryan, in his official capacity as
28

                                    1

Director of the Arizona Department of Corrections ("ADC"); Greg Fizer, Warden of the Arizona State Prison Complex ("ASPC") Florence and Jane Doe Fizer; Stephen Morris, Deputy Warden of the ASPC Florence, Central Unit and Jane Doe Morris; Captain John Doe Curtis, Chief of Security of the ASPC Florence, Central Unit and Jane Doe Curtis; Lieutenant George Smith and Jane Doe Smith; John Doe Moody, Warden of the ASPC Lewis; John Doe Shift Commander at ASPC Lewis, Bachman Unit and Jane Doe Shift Commander; Terry Hibbard, Deputy Warden of the ASPC Lewis, Eagle Point Unit and Jane Doe Hibbard; Lieutenant John Doe Lunka and Jane Doe Lunka; Therese Schroeder, Warden at ASPC Tucson and John Doe Schroeder; Walt Hensley, Deputy Warden at ASPC Tucson, Cimarron Unit and Jane Doe Hensley; Glenn Pacheco, Deputy Warden at ASPC Tucson, Cimmaron Unit and Kim Pacheco; Chris Josefowicz, Assistant Deputy Warden at APSC Tucson, Cimmaron Unit and Jane Doe Josefowicz; Captain Mike Childeree, Chief of Security at ASPC Tucson, Cimarron Unit and Jane Doe Childeree; Alfredo Ramos, Warden of ASPC Tucson and Jane Doe Ramos; Daniella Stemple, Deputy Warden at ASPC Tucson, Cimarron Unit and John Doe Stemple; Captain Jay Ritchie, Chief of Security at ASPC Tucson, Cimarron Unit and Jane Doe Ritchie; Laura Escapule, Warden of ASPC Yuma and John Doe Escapule; Rose Sanders, Deputy Warden of ASPC Yuma Dakota Unit and John Doe Sanders; Captain John Doe Carol, Chief of Security for ASPC Yuma and Jane Doe Carol; COIV Laura Pyle;

John McAdorey, Deputy Warden of ASPC Tucson Santa Rita Unit; John And/Or Jane Doe Captain; John And/Or Jane Doe Lieutenant; John And/Or Jane Doe Sergeant; John And/Or Jane Doe Corrections Officers; John And Jane Does 1 – 40,

        Defendants.

For their Complaint against Defendants, Plaintiffs Christopher Russett, David Holder, Desiree Knighton, Doug Schuster, Tim Baca, Armando Salazar, Susette Kohler, Ricardo Acosta, and Eduardo Osuna hereby allege as follows:

## PARTIES

1.    Plaintiff Christopher Russett ("Christopher") is a resident of Maricopa County, Arizona who is employed by the ADC as a Corrections Officer.

2.    Plaintiff David Holder ("David") is a resident of Maricopa County, Arizona who is employed by the ADC as a Corrections Officer.

3.    Plaintiff Desiree Knighton ("Desiree") is a resident of Maricopa County, Arizona who is employed by the ADC as a Corrections Officer.

4.    Plaintiff Tim Baca ("Tim") is a resident of Pima County, Arizona who is employed by ADC as a Corrections Officer.

5.    Plaintiff Armando Salazar ("Armando") is a resident of Pima County, Arizona who is employed by ADC as a Corrections Officer.

6.    Plaintiff Doug Schuster ("Doug") is a resident of Maricopa County, Arizona who was employed by the ADC as a Deputy Warden.

7.    Plaintiff Susette Kohler ("Susette") is a resident of Yuma County, Arizona who is employed by the ADC as a Corrections Officer.

8.    Plaintiff Ricardo Acosta ("Ricardo") is a resident of Pima County, Arizona who is employed by the ADC as a Corrections Officer.

9.     Plaintiff Eduardo Osuna ("Eduardo") is a resident of Pima County, Arizona who is employed by the ADC as a Corrections Officer.

10.     Defendant Charles Ryan ("Ryan") is an Arizona resident and the Director of the Arizona Department of Corrections ("ADC").

11.     Defendant Greg Fizer ("Fizer") is an employee of the ADC and was, at the relevant time, the warden at the Arizona State Prison Complex in Florence (the "ASPC-Florence"). As Warden, Fizer is responsible for the operation of ASPC-Florence, including, without limitation, ensuring that each unit in ASPC-Florence is staffed and operated in a manner that provides a safe and secure working environment for staff and inmates, including Christopher.

12.     Defendant Stephen Morris ("Morris") is an employee of the ADC and was, at the relevant time, the Deputy Warden of the Central Unit in ASPC-Florence (the "Central Unit"). As Deputy Warden, Morris is responsible for the operation of the Central Unit, including, without limitation, ensuring that the Central Unit is staffed and operated in a manner that provides a safe and secure working environment for staff and inmates, including Christopher.

13.     Defendant Captain JOHN DOE Curtis ("Curtis") is an employee of the ADC and was, at the relevant time, the Chief of Security of the Central in ASPC-Florence. As Chief of Security, Morris is responsible for the operation of the Central Unit, including, without limitation, ensuring that the Central Unit is staffed and operated in a manner that provides a safe and secure working environment for staff and inmates, including Christopher.

14.     Defendant Lieutenant George Smith ("Smith") is an employee of the ADC and was, at the relevant time, the Shift Commander of the Central in ASPC-Florence. As Shift Commander, Morris is responsible for the operation of the Central Unit, including, without limitation, ensuring that the Central Unit is staffed and operated in a manner that provides a safe and secure working environment for staff and inmates, including Christopher.

15.     Defendant JOHN DOE Moody ("Moody") is an employee of the ADC and was, at the relevant time, the Warden at the Arizona State Prison Complex Lewis (the "ASPC-Lewis"). As Warden, Moody is responsible for the operation of ASPC-Lewis, including, without

limitation, ensuring that each unit in ASPC-Lewis is operated in a manner that provides a safe and secure working environment for staff and inmates, including David, Desiree, and Doug.

16.    Defendant Deputy Warden Terry Hibbard ("Hibbard") is an employee of the ADC was, at the relevant time, the Deputy Warden of the Eagle Point Unit in ASPC-Lewis (the "Eagle Point Unit"). As Deputy Warden, Hibbard is responsible for the operation of the Eagle Point Unit, including, without limitation,  ensuring that the Eagle Point Unit is operated in a manner that provides a safe and secure working environment for staff and inmates, including Desiree.

17.    Defendant Lieutenant JOHN DOE Lunka ("Lunka") is an employee of the ADC was, at the relevant time, the Chief of Security for the Eagle Point Unit. As Chief of Security, Lunka is responsible for the operation of the Eagle Point Unit, including, without limitation, ensuring that the Eagle Point Unit is operated in a manner that provides a safe and secure working environment for staff and inmates, including Desiree.

18.    Defendant JOHN DOE CHIEF OF SECURITY is an employee of the ADC and was, at the relevant time, the Chief of Security for the Morey Unit in ASPC-Lewis (the "Morey Unit"). As Chief of Security, JOHN DOE is responsible for the operation of the Morey Unit, including, without limitation, ensuring that the Morey Unit is operated in a manner that provides a safe and secure working environment for staff and inmates, including David.

19.    Defendant JOHN DOE SHIFT COMMANDER is an employee of the ADC and was, at the relevant time, the Shift Commander for the Morey Unit in ASPC-Lewis (the "Morey Unit"). As Shift Commander, JOHN DOE is responsible for the operation of the Morey Unit, including, without limitation, ensuring that the Morey Unit is operated in a manner that provides a safe and secure working environment for staff and inmates, including David.

20.    Defendant Sergeant JANE DOE Ramirez ("Ramirez") is an employee of the ADC and was, at the relevant time, a Sergeant in the Morey Unit.

21.    Defendant COII JANE DOE Pizanno ("Pizanno") is an employee of the ADC and was, at the relevant time, assigned in the Morey Unit.

22.    Defendant Therese Schroeder ("Schroeder") was an employee of the ADC and was, at the relevant time, the Warden at the Arizona State Prison Complex Tucson (the "ASPC-

Tucson"). As Warden, Schroeder was responsible for the operation of ASPC-Tucson, including, without limitation, ensuring that each unit in ASPC-Tucson was operated in a manner that provided a safe and secure working environment for staff and inmates, including Tim.

23.     Defendant Walt Hensley ("Hensley") is an employee of the ADC was, at the relevant time, the Assistant Deputy Warden of the Cimarron ASPC-Tucson (the "Cimarron Unit"). As Assistant Deputy Warden, Hensley was responsible for the operation of the Cimarron Unit, including, without limitation, ensuring that the Cimarron Unit was operated in a manner that provided a safe and secure working environment for staff and inmates, including Tim.

24.     Defendant Mike Childeree ("Childeree") was an employee of the ADC was, at the relevant time, the Chief of Security for the Cimarron Unit. As Chief of Security, Childeree was responsible for the operation of the Cimarron Unit, including, without limitation, ensuring that the Cimarron Unit is operated in a manner that provided a safe and secure working environment for staff and inmates, including Tim.

25.     Defendant Alfredo Ramos ("Ramos") was an employee of the ADC and was, at the relevant time, the Warden at the Arizona State Prison Complex Tucson (the "ASPC-Tucson"). As Warden, Ramos is responsible for the operation of ASPC-Tucson, including, without limitation, ensuring that each unit in ASPC-Tucson is operated in a manner that provides a safe and secure working environment for staff and inmates, including Armando and Eduardo.

26.     Defendant Pacheco ("Pacheco") is an employee of the ADC was, at the relevant time, the Deputy Warden of the Cimarron ASPC-Tucson (the "Cimarron Unit").  As Deputy Warden, Pacheco was responsible for the operation of the Cimarron Unit, including, without limitation, ensuring that the Cimarron Unit was operated in a manner that provided a safe and secure working environment for staff and inmates, including Tim and Eduardo.

27.     Defendant Chris Josefowicz ("Josefowicz") is an employee of the ADC was, at the relevant time, the Assistant Deputy Warden of the Cimarron ASPC-Tucson (the "Cimarron Unit"). As Assistant Deputy Warden, Josefowicz is responsible for the operation of the Cimarron Unit, including ensuring that the Cimarron Unit is operated in a manner that provides a safe and secure working environment for staff and inmates, including Armando.

28.     Defendant Daniella Stemple ("Stemple") is an employee of the ADC is, at the relevant time, the Deputy Warden of the Cimarron ASPC-Tucson (the "Cimarron Unit"). As Deputy Warden, Stemple is responsible for the operation of the Cimarron Unit, including, without limitation, ensuring that the Cimarron Unit is operated in a manner that provides a safe and secure working environment for staff and inmates, including Armando.

29.     Defendant Jay Ritchie ("Ritchie") is an employee of the ADC and was, at the relevant time, the Chief of Security for the Cimarron Unit. As Chief of Security, Ritchie is responsible for the operation of the Cimarron Unit, including, without limitation, ensuring that the Cimarron Unit is operated in a manner that provides a safe and secure working environment for staff and inmates, including Armando.

30.     Defendant Laura Escapule ("Escapule") is an employee of the ADC and was, at the relevant time, the warden at the ASPC-Yuma. As Warden, Escapule is responsible for the operation of ASPC-Yuma, including, without limitation, ensuring that each unit in ASPC-Yuma is staffed and operated in a manner that provides a safe and secure working environment for staff and inmates, including David.

31.     Defendant Rose Sanders ("Sanders") is an employee of the ADC and was, at the relevant time, the Deputy Warden of the ASPC Yuma – Dakota Unit (the "Dakota Unit"). As Deputy Warden, Sanders is responsible for the operation of the Dakota Unit, including, without limitation, ensuring that the Dakota Unit is staffed and operated in a manner that provides a safe and secure working environment for staff and inmates, including David.

32.     Defendant Captain JOHN DOE Carol ("Carol") is an employee of the ADC and was, at the relevant time, the Chief of Security of the ASPC-Yuma Dakota Unit. As Chief of Security, Carol is responsible for the operation of the Dakota Unit, including, without limitation, ensuring that the Dakota Unit is staffed and operated in a manner that provides a safe and secure working environment for staff and inmates, including David.

33.     Defendant COIV Laura Pyle ("Pyle") is an employee of the ADC and was, at the relevant time, the in charge of the employees of the ASPC-Yuma Dakota Unit. Pyle is responsible for the operation of the Dakota Unit, including, without limitation, ensuring that the

7

Dakota Unit is staffed and operated in a manner that provides a safe and secure working environment for staff and inmates, including David.

34.     Defendant John McAdorey ("McAdorey") is an employee of the ADC and was, at the relevant time, the Deputy Warden of the Santa Rita Unit of ASPC-Tucson ("Santa Rita Unit"). As Deputy Warden, McAdorey was responsible for the operation of the Santa Rita Unit, including, without limitation, ensuring that the Santa Rita Unit was operated in a manner that provided a safe and secure working environment for staff and inmates, including Ricardo.

35.     Defendants John Doe Ramirez, Munoz, Pizanno, Escapule, Sanders, Pyle and Jane Does Fizer, Morris, Curtis, Hibbard, Fisher, Wright, Schroeder, Hensley, Childeree, Ramos, Stemple, Carol, and Ritchie are named because, at all relevant times herein, their spouses were acting for the benefit of their respective marital communities, and therefore the respective marital communities are liable for their acts.

36.     Defendants John and/or Jane Doe Warden, Deputy Warden, Captain, Lieutenant, Sergeant, Corrections Officers are employees of the ADC who, during the relevant time, were assigned to the various ADC Units, but whose identities have not yet been ascertained. The identities of these individuals are, however, well known by Defendants.  Plaintiffs will amend their complaint to allege the true names of the various Doe Defendants when they are learned.

37.     John and Jane Does 1 through 40 are certain unknown ADC employees who through their own actions or inactions have caused or assisted others in causing the incidents and resulting harm set forth below.  The identities of these individuals have not yet been ascertained but they are well known by Defendants.  Plaintiffs will amend their complaint to allege the true names and capacities of the various Doe Defendants when they are learned.

38.     At all relevant times described herein, Defendants were acting under the color of law.

## JURISDICTION, AND VENUE

39.     This Court has jurisdiction over this action and the parties.

40.     Venue is proper in this Court.

8

**GENERAL ALLEGATIONS**

41.     ADC Director Ryan emphatically proclaims on the ADC website that the ADC is "dedicated to public, staff and inmate safety by effectively employing sound correctional practices, efficient operational procedures and proven programming opportunities for inmates."

42.     This statement is false.

43.     The ADC does not employ sound correctional practices and, as a result, the safety of ADC staff, inmates and the public has been compromised.

44.     This lawsuit concerns the devastating and permanent injuries sustained by the Plaintiffs as a result of the obvious and well-known dangerous conditions created by the Defendants' failure to employ sound correctional practices.

**CORRECTIONS OFFICER CHRISTOPHER RUSSETT**

45.     Plaintiff Christopher Russett ("Christopher") began working in corrections in 1998, at the Albany County Correctional Facility, in Albany, New York.

46.     Christopher applied for a job with the ADC in May 2011.

47.     After accepting employment with the ADC, Christopher attended and completed the Arizona Correctional Officer Training Academy (the "Academy") in June 2011.

48.     Christopher was then assigned to work at the ASPC-Florence in the Central Unit beginning in July 2011.

49.     The inmates that are housed in the Central Unit are Level-5 offenders and are sentenced there because they are violent and quick-tempered.

50.     In addition to their violent nature, most of the inmates in the Central Unit are also mental health patients. Besides death row, the inmates at Central Unit are colloquially referred to as the "worst of the worst."

51.     Christopher worked at the ASPC-Florence Central Unit until September 2013.

52.     Christopher briefly left the ADC between September 2013 and October 2014 in order to fill a civilian position with the United States Air Force Reserves.

53.     Upon completion of his deployment with the Air Force Reserves, Christopher returned to the ADC and the Central Unit in October 20, 2014.

9

54.     Prior to his brief departure from the ADC, most of the inmates at Central Unit were required to be shackled whenever they would leave their cells. This is due, in part, to the violent nature of these inmates and/or the severity of their crimes.

55.     When Christopher returned to the ADC and to the Central Unit in October 2014, the ADC had changed its policies and the inmates in the Central Unit were no longer required to be handcuffed whenever they left their cells to go to the cafeteria or to the recreation yard.

56.     When Christopher returned, there were approximately 120 Level-5 inmates house in the Central Unit.

57.     When Christopher returned, he was assigned to work the overnight shift from 10:00 p.m. to 6:00 a.m.

58.     At approximately 6:00 a.m. on December 8, 2014, Christopher ended his overnight shift.

59.     However, due to the shortage of corrections officers that were scheduled to report for the morning shift in the Central Unit, Christopher was asked to work overtime. Christopher agreed to remain on shift.

60.     Such staffing shortages are routine within the ADC, including the Central Unit, and are well known by Defendants Fizer, Morris, and Curtis and others.

61.     In fact, due to staffing shortages across the ADC, Christopher was frequently asked to work overtime.

62.     On December 8, 2014, the Central Unit was short several correctional officers, so much so that it had less officers than was required to safely operate the Unit.

63.     At approximately 9:30 a.m. the inmates of the Central Unit were to be moved back to their cells after morning recreation.  Each of the inmates that were not already in their cells were ordered to assemble and line up in order to start walking in from the recreation yard.

64.     As a matter of procedure, the inmates are expected to organize and walk into the housing unit, in a specific order, so that the inmates can be quickly and efficiently returned to their cells.

65.    Due to the ADC staffing shortages described above, there were only four corrections officers inside the Central Unit that morning. One officer was assigned to the control room.  One officer was working the gate mechanism that is used to open and close the inmates' cells. Christopher was one of two floor officers expected to watch, monitor, and maneuver approximately 120, Level-5 offenders into their cells in a timely manner.

66.    As inmates were called to return to their cells, Christopher walked inside the housing building to monitor the inmates as they lined up.

67.    There were, however, too many known violent inmates for Christopher to safely monitor and control.

68.    As Christopher monitored the inmates, Inmate Hilton approached Christopher from behind and, without warning, hit Christopher with a closed fist on the back of the head, instantly knocking him out and causing Christopher to fall to the ground and hit his head on the floor.

69.    Inmate Hilton then proceeded to kick and punch Christopher's head and neck.

70.    Inmate Hilton's attack lasted for several minutes without interruption.

71.    Eventually Inmate Hilton was subdued by another correctional officer.

72.    Inmate Hilton was well known to the supervisors of the Central Unit, including Defendants Fizer, Morris, Curtis, and Smith, to be violent because Hilton had, on at least two prior occasions in the previous six months, violently assaulted other corrections officers at the Florence Central Unit.

73.    Inmate Hilton was supposed to have a higher security level, but Inmate Hilton's security level was overridden and he was allowed to stay in the Central Unit despite the fact that he had committed violent assaults on staff twice in the previous six months and was a member of a criminal gang.

74.    The lack of proper staffing levels for a Level-5 yard, which are filled with inmates that are known to be violent—and often mentally ill—and who should have had higher classifications, created an obvious unsecure and dangerous environment.

75. The existence of such an obvious unsecure and dangerous environment was well-known by Defendants Fizer, Morris, Curtis, and Smith.

76. Despite the fact that Hilton had twice before violently assaulted corrections officers, was known by the ADC staff to be a gang member, and extremely violent, Inmate Hilton was permitted to remain in the general inmate population and also to remain unshackled through all inmate movements. This created a significant risk to the health and safety of the inmates and corrections staff, including Christopher, that otherwise would not have existed.

77. Defendants Fizer, Morris, Curtis, and Smith each contributed to creation of this obvious unsecure and dangerous environment and were each deliberately indifferent to Christopher's rights when they permitted the unrestrained movement of dangerous and violent inmates while the Central Unit was severely understaffed and manned by guards who were working consecutive shifts.

78. As a direct and proximate result of Defendants Fizer, Morris, Curtis, and Smith's deliberate indifference, the opportunity for Hilton to attack Christopher was created which would have otherwise would not have existed.

79. As a result of that attack, Christopher suffered significant, debilitating, and permanent physical and emotional injuries, including a traumatic brain injury, a concussion, bruises, cuts, a fractured cheekbone, a dislocated jaw, and required surgery to reattach his right earlobe that was nearly severed off.

80. As a result of the severe and permanent injuries sustained in the assault, Christopher can no longer work for the ADC and is unable to find work.

## CORRECTIONS OFFICER DAVID HOLDER

81. Plaintiff David Holder ("David") completed the Academy in December 2013.

82. Upon completion of the Academy, David was assigned to work at ASPC Lewis, in the Morey Unit.

83. More specifically, David worked in Building #1 as the A/B Control Room Operator on the Blue Yard.

84.   In addition to Control Room Operators, the ADC also designates certain officers to be Floor Officers. A Floor Officer is assigned to work in various locations within the Unit, including, without limitation, patrolling the Unit, observing and interacting with inmates, and ensuring that safety and security protocols are enforced.

85.   As a Control Room Operator, David is responsible for observing and controlling all aspects of inmate and staff movement within Building #1, including opening all inmate cell doors.

86.   Commanders at the ADC, including the Morey Unit, utilize a policy called "Collapse and Control" wherein corrections officers are commanded to leave their assigned posts for the purpose of covering areas that are short-staffed.

87.   On February 3, 2014, the Blue Yard was staffed with less officers than needed to safely operate, and was at least four officers short of the minimum number of officers the ADC believes it needs to safely operate the Blue Yard.

88.   Such staffing shortages are routine within the ADC, including the Morey Unit, and are well known to Defendants Warden Moody and John Doe Chief of Security.

89.   Accordingly, David's supervisors called a "Collapse and Control" and David was reassigned from his post in the Control Room to accompany the pill nurse as she disbursed medication to inmates in the Blue Yard.

90.   After medications were distributed in the Blue Yard, David would normally have escorted the pill nurse to the entrance of the Red Yard, where an officer from the Red Yard would assume responsibility and accompany the pill nurse through the Red Yard.

91.   Because the ADC regularly experiences staffing shortages, it is unsurprising that the Red Yard was also experiencing a staffing shortage.

92.   Accordingly, the Red Yard was ordered to "collapse and control." There was no corrections officer to relieve David and accompany the pill nurse through the Red Yard.

93.   David contacted his supervisor, Defendant Sergeant Ramirez ("Ramirez"), who ordered David to accompany the pill nurse through the Red Yard.

94.     Unbeknownst to David, at approximately 5:00 p.m. while David was still accompanying the pill nurse through the Blue Yard, Inmate Ratliff exposed himself to CO Pizzano, a female officer, as he was leaving the showers in Building #3 in the Red Yard.

95.     At the time that Inmate Ratliff exposed himself to CO Pizzano, he was designated as a Level-4 inmate.

96.     As a result of his actions, Inmate Ratliff should have been reported and immediately segregated from the general population for safety.

97.     Instead, Ramirez confronted Ratliff about exposing himself to female staff and ordered Inmate Ratliff to return to his cell.

98.     Ramirez then ordered COII Pizzano to lock Inmate Ratliff in his cell.

99.     Inmate Ratliff immediately became angry and threatened all ADC staff, yelling out for the entire building to hear: "the next one of you motherfuckers I see is mine!"

100.    Because Inmate Ratliff was so angry, aggressive, and threatening toward the corrections officers, Ramirez commanded Pizzano to not open Inmate Ratliff's cell door for any reason.

101.    Again, Ramirez failed to segregate Inmate Ratliff as ADC and sound correctional policy requires.

102.    After locking Inmate Ratliff back into his cell, Sgt. Ramirez left the building.  The only corrections officer present in Building #3 was the control room operator, Pizzano, who could not leave the control room.

103.    David was completely unaware of Inmate Ratliff's outburst and threats of violence against corrections officers when he approached Inmate Ratliff's cell and requested the cell door to be opened for medication to be dispensed. This is because the radio traffic from the Red Yard is on a different channel than the radio traffic than Blue Yard.

104.    Despite knowing about Inmate Ratliff's threatening behavior, and being ordered by Ramirez to keep Inmate Ratliff locked in his cell, Pizzano did not make any effort to warn David and instead simply opened the door to Inmate Ratliff's cell door.

14

105.    As the door opened, Inmate Ratliff stepped toward the door and reached out to accept his medication.  After receiving his medication, Inmate Ratliff took a small step back into his cell.

106.    Inmate Ratliff's cell door was broken and/or disabled to the point that Inmate Ratliff could prevent the door from closing fully.

107.    In fact, many of the cell doors in the Morey Unit, including Inmate Ratliff's door had been reported to Defendant Warden Moody as malfunctioning or broken, and were in use without being repaired.  The result of the disrepair is that many of the cell doors do not lock and are therefore not fully controlled by the control room operator.

108.    Plainly put, inmates can open their cell doors at any time.

109.    As Inmate Ratliff's door finished closing, Inmate Ratliff pushed the door open and made good on his threat by striking David's face with his closed fist.

110.    Blindsided by Inmate Ratliff's punch, David stumbled back and fell to the ground.

111.    Inmate Ratliff then proceeded to savagely kick and punch David, while David lay in shock, defenseless on the ground.

112.    Due to staffing shortages, there were no other Floor Officers in Building #3 who were nearby to assist David and so the beating continued, unabated.

113.    After a few moments of struggling, David was able to grab Inmate Ratliff's leg and pull him to the ground while the fighting continued.

114.    Finally, CO Pizzano noticed that David was being assaulted and called an ICS to summon other corrections officers to the area.

115.    However, due to the staffing shortage and "collapse and control" that had been called, the nearest floor officer that could respond was in Building #4, which is approximately 100 yards away.

116.    The fight continued for approximately three more minutes before another officer finally arrived to assist David.

117.    Once help arrived, Inmate Ratliff was finally sent to the segregated holding cell, the same cell where ADC and sound correctional policies require he should have been sent after

1   first exposing himself to CO Pizzano and making distinct and dangerous threats of violence
2   against corrections staff.

3       118.    Upon arriving at the scene, Ramirez exclaimed that he "knew this would happen,"
4   and "I told Pizzano not to open that door."

5       119.    Operating the Morey Unit with failing equipment, such as cell doors, inadequate
6   staffing, and improper segregation of inmates who have assaulted and threatened corrections
7   officers, created an obvious unsafe and dangerous environment for inmates and corrections
8   officers, including David, that otherwise would not have existed.

9       120.    The existence of such an obvious unsecure and dangerous environment was well-
10  known by Defendants.

11      121.    Defendants Warden Moody, John Doe Chief of Security, John Doe Shift
12  Commander, Sergeant Ramirez, and COII Pizanno each contributed to the creation of this
13  obvious unsecure and dangerous environment and were deliberately indifferent to David's rights
14  when they permitted the Morey Unit to operate while understaffed and with equipment and
15  fixtures that were known to be faulty and/or defective.

16      122.    Moreover, Ramirez was deliberately indifferent when she ignored the risk of what
17  he "knew would happen."

18      123.    As a result of the deliberate indifference of Defendants Warden Moody, John Doe
19  Chief of Security, John Doe Shift Commander and Sergeant Ramirez and COII Pizanno, an
20  opportunity for Inmate Ratliff to attack David was created which otherwise would not have
21  existed.

22      124.    As a result of that attack, David suffered physical and emotional injuries, including
23  a maxillary fracture to the right side of his face, as well as a torn labrum.

24      125.    David has been required to have surgery to repair his labrum and another surgery
25  to implant a titanium plate in order to repair his facial structure. David still receives counseling
26  for Post-Traumatic Stress Disorder related to the assault.

27

28

126.   As a result of his physical and psychological injuries, David is now unable to pursue a career in law enforcement because any strike to the head may result in serious brain injuries or worse.

## CORRECTIONS OFFICER DESIREE KNIGHTON

127.   At the time of her assault, Plaintiff Desiree Knighton ("Desiree") had been employed by the ADC for approximately twenty-one months.

128.   Throughout her tenure, Desiree was assigned to work at the ASPC Lewis in the Morey Unit.

129.   However, on March 6, 2014, the Eagle Point Unit was experiencing a staffing shortage.

130.   The staffing shortage was so great that officers from nearby units were asked to work overtime at the Eagle Point Unit.

131.   Such staffing shortages are routine within the ADC, including the Eagle Point Unit.

132.   Upon arriving at Eagle Point to work overtime, Desiree was initially assigned to work "program security."

133.   However, Eagle Point's Chief of Security, Lt. Lunka, reassigned Desiree to be a "Yard Set" officer.

134.   Upon being assigned as the Yard Set officer, Desiree told Lt. Lunka that she had only worked at Eagle Point on one previous occasion in the detention unit and that, as a result, she was unfamiliar with the yard and the duties of a Yard Set officer.

135.   Desiree was not provided with the requisite post orders or given any "on the job training" instructions by Lt. Lunka or any other supervisor.

136.   Desiree proceeded to the recreation yard where COII Crumb provided her with basic instructions on how to complete health and welfare checks on inmates, and provided her a list of inmates that she needed to wake up in order to send to the prison's medical unit.

137.   After completing the health and welfare checks on the "A" run, Desiree looked down to her list of inmates that needed to be awakened.

138.   As Desiree looked at her list, Inmate Braxton approached her.

139.   Without provocation or notice, Inmate Braxton violently and viciously struck Desiree with a mesh bag full of gravel and sharp rocks on the left side of her face.

140.   Upon being hit on the head, Desiree's left eye immediately swelled shut.

141.   Desiree crouched down in an effort to protect herself from further blows.

142.   However, Inmate Braxton overpowered Desiree and continued to hit her on the head with the bag of rocks an additional six times.

143.   Desiree was eventually able to get away from Inmate Braxton and use her radio to call for assistance.

144.   When reporting that day, Desiree was unfamiliar with the Eagle Point Unit and she was not provided with any warnings or information regarding the security risks that officers and supervisors of Eagle Point Unit were very well aware of.

145.   Specifically, corrections officers and supervisors, including Defendants Hibbard, Lunka and others in the Eagle Point Unit, were well aware that Inmate Braxton's nickname is "Psycho."

146.   Corrections officers and supervisors, including Defendants Hibbard, Lunka and others in the Eagle Point Unit, also knew, or should have known, that Inmate Braxton was a violent and troubled inmate.

147.   Corrections officers and supervisors, including Defendants Hibbard, Lunka and others in the Eagle Point Unit, also knew, or should have known, that Inmate Braxton had lost his job with Swift Transportation and had begun to act in an erratic and aggressive manner.

148.   Corrections officers and supervisors, including Defendants Hibbard, Lunka and others in the Eagle Point Unit, also knew, or should have known, that Inmate Braxton had recently tested positive for methamphetamines and had stayed awake for two or three days, prior to the assault.

149.   Corrections officers and supervisors, including Defendants Hibbard, Lunka and others in the Eagle Point Unit, also knew, or should have known, that Inmate Braxton had threatened to "take out a CO."

150.    Despite his violations of ADC rules and regulations, including illicit drug use and making threats against ADC staff, Inmate Braxton was not removed from the Unit, nor was he placed in administrative segregation.

151.    Even though corrections officers and supervisors, including Defendants Hibbard, Lunka and others in the Eagle Point Unit knew about Inmate Braxton's history of violence, illicit drug use, administrative discipline, and threats of violence against staff, nobody warned Desiree of this well-known threat to her safety, nor did anyone take any steps to insure that such vital information was relayed to Desiree—an officer from another unit who was unfamiliar with the unit operations and its population.

152.    The decision to operate the Eagle Point Unit without proper staffing levels, by utilizing staff that was untrained, and without properly isolating dangerous inmates, created an unsecure and dangerous environment that otherwise would not have existed.

153.    The existence of such an obvious unsecure and dangerous environment was well-known by Defendants Moody, Hibbard, Lunka and others in the Eagle Point Unit.

154.    Defendants Moody, John Doe Deputy Warden, John Doe Shift Commander, and Lieutenant Lunka each contributed to creation of this obviously unsecure and dangerous environment. Further, each of the Defendants were deliberately indifferent to Desiree's rights by creating the opportunity for Inmate Braxton to attack Desiree that he otherwise would not have had.

155.    As a result of that attack, Desiree has permanently lost vision in her left eye and had required three separate surgeries to repair her broken nose and eye socket.

156.    In addition to her physical pain, Desiree has sustained permanent disfigurement, as well as various psychological trauma and emotional distress, including Post-Traumatic Stress Disorder.

157.    To further her law enforcement career goals, Desiree had, prior to being attacked by Inmate Braxton, applied to work in the Criminal Investigation Unit (CIU) with the ADC.

158.    However, as a result of the assault and the injuries that she sustained, Desiree will never be able to pursue her career goals of working in the CIU, as a police officer, or in criminal

forensics.   The injuries that she has sustained will prevent her from becoming P.O.S.T. certified. Further, she was discharged from the United States Army Non-Deployment Status because of her loss of vision.

## DEPUTY WARDEN DOUG SCHUSTER

159.   At the time of his assault, Plaintiff Doug Schuster ("Doug") had been employed by the ADC for approximately thirty years and had spent the previous three and a half years working as the Deputy Warden of the Morey Unit at ASPC Lewis.

160.   Prior to his assault, the Morey Unit had been on lock-down for several days due to violent riots between members of various races in the Morey Unit.

161.   Despite this, it was decided that the lock-down in the Morey Unit was to be lifted and normal operations at Morey Unit were to resume on the morning of Friday, January 24, 2014.

162.   On January 24, 2014, after the daily morning briefing, the staff at the Morey Unit contacted Doug to inform him that security had found an anonymous note left by an inmate that indicated there were still serious, ongoing racial tensions between inmates.

163.   These serious, ongoing tensions represent real and significant risks of an inmate riot and increases the danger for inmates and staff of the Morey Unit.

164.   Additionally, a riot in one unit will frequently cause tension between inmates in nearby units.  Therefore, it is critical to conduct a speedy and thorough investigation of any and all threats of riots.

165.   In order to get the critical information about the racial tensions before meeting with Defendant Warden Moody, Doug went to the Morey Unit recreation yard to talk with the corrections officers and to the meet with inmates of the different racial groups.

166.   On January 24, 2014, the Morey Unit was experiencing a staffing shortage. The staffing shortage was caused, in part, because the Morey Unit was required to cross-level out various staff members to cover for officer shortages at other nearby units.

167.   Such staffing shortages are routine within the ADC, including the Morey Unit, and are well known to Defendant Warden Moody.

168.    As a result of the staffing shortage, the Morey Unit was minimally staffed and Doug did not have additional officers to accompany him to the recreation yard where the inmates were assembled.

169.    Faced with the risk of another violent race riot that would place inmates and staff at risk for injury, Doug proceeded into the recreation yard to talk with the inmates.

170.    After reaching a table where several inmates were seated, Doug began talking to them.

171.    It quickly became clear that the inmates appeared agitated. When Doug asked Inmate Salley to step aside with him to discuss what the problems were, Inmate Salley refused to speak to him.

172.    Instead, Inmate Salley stood up from the bench and appeared to be walking with Doug to initiate a one-on-one conversation.

173.    Without warning, Inmate Salley launched a vicious attack, blindsiding Doug.

174.    Inmate Salley repeatedly punched and kicked Doug in the head, face, ribs and back.

175.    Because of the well known staffing shortages, there were no guards nearby to render assistance to Doug.

176.    The attack continued until it was eventually broken up by guards, located in the tower, who deployed non-lethal rounds to subdue Inmate Salley.

177.    Doug was immediately seen by on-site medical staff and then transported, by ambulance, to the hospital.  At the hospital, Doug was treated in the ER, given an IV and CAT scan.

178.    After being discharged from the hospital, Doug recovered at home for two days and returned to work on Monday.

179.    Shortly after returning to work, Doug began to experience constant, debilitating headaches.

180.    Due to the constant and debilitating headaches, Doug saw his primary care physician who ordered an MRI that took place on February 17, 2014.

181.   The MRI showed bleeding on both sides of Doug's brain.

182.   Doug returned to work and provided the MRI reports to Defendant Warden Moody and the Occupational Health Nurse.

183.   Two days later, another large inmate disturbance took place on the yard.

184.   Defendant Warden Moody ordered Doug to quell the disturbance.

185.   One of the responding corrections officers threw a flash-bang grenade that landed at Doug's feet.

186.   As the flash-bang grenade exploded, it caused Doug intense pain.

187.   Doug remained at work for about an hour and then told the Defendant Warden Moody that he had to go home because the flash-bang grenade triggered a debilitating headache.

188.   Defendant Warden Moody was well aware of the unsecure and dangerous environment that existed at the Morey Unit. For months preceding the attack, Doug had been complaining to Defendant Warden Moody about the myriad issues at the Morey Unit, including the lack of proper staffing for the unit and the fact that the cell doors were malfunctioning and not working properly.

189.   The lack of proper staffing levels at the Morey Unit, filled with inmates known to have consistent racial tension, created an unsecure and dangerous environment that otherwise would not have existed.

190.   Defendant Warden Moody was deliberately indifferent to Doug's rights when he made the decision to operate the Morey Unit while severely understaffed with corrections officers. This is especially true given that Defendant Warden Moody was fully aware of the racial tension within the Morey Unit.

191.   As a result of Defendant Warden Moody's deliberate indifference to Doug's rights, Doug was attacked. In the attack  he sustained tremendous head injuries which required brain surgery to drain blood and reduce pressure on both sides his head.  During the surgery, doctors implanted two titanium plates in his skull, thereby leaving Doug with permanent disfigurement and scarring along with the risk that another blow to his head could kill him.

22

192.     In addition to brain surgery, Doug experiences memory loss, continued debilitating headaches, pain in his jaw, loss of balance, loss of sensation and feeling in his right foot, and an uncontrollable gag response.

193.     Doug requires prescription strength medication to help his insomnia and counseling for the psychological effects of the assault.

194.     Doug's doctors have told him that he can no longer work in the corrections environment. As Deputy Warden and a life-long corrections officer, Doug earned a decent wage. However, as a result of the events and injuries described above, Doug is unable to find any employment.

## CORRECTIONS OFFICER TIM BACA

195.     At the time of his assault, Plaintiff Tim Baca ("Tim") had been employed as a Corrections Officer with ADC for approximately 8 years at ASPC Tucson at the Cimarron Unit.

196.     On June 10, 2014, Tim was conducting health and welfare checks on inmates in Cimarron Housing Unit 1 AB.

197.     Cimarron Housing Unit 1 AB holds at least 100 inmates.

198.     At the time some of the inmates in Cimarron Housing Unit 1 AB were participating in a "step down" program.  These were inmates, who are among the most dangerous in the ADC, who were trying to "step down" from a very high custody level to a lower custody level with fewer restrictions.

199.     Tim discovered that Inmate AS was not in his assigned cell.

200.     After Tim redirected Inmate AS to his assigned cell, Inmate AS became agitated and aggressive.

201.     Tim and another corrections officer managed to control the situation and direct Inmate AS into his cell and secured the cell door.

202.     Tim reported the incident to a supervisor who directed Tim to go back to work in the housing unit, lock down Inmate AS for 72 hours, and place him on report.

203.     Approximately two hours later, a large number of inmates were returning from the recreation yard.

204.   Tim was alone in the unit, attempting to lock down all of the incoming inmates.

205.   On June 10, 2014, the Cimarron Unit was short staffed and, as such, it lacked the number of officers needed to safely operate.

206.   Such staffing shortages are routine throughout the ADC, including the Cimarron Unit.

207.   As Tim was locking down inmates, Inmate AS was able to leave his cell and attack Tim.

208.   Inmate AS knocked Tim to the ground and other inmates joined in the attack, kicking and punching Tim while he was down on the ground.

209.   The control room officer saw the attack and called for assistance.

210.   Officers from other units rushed to Cimarron Unit 1 AB to rescue Tim.

211.   When the rescuers reached the Cimarron Unit Main Door, they were unable to enter the Cimarron Unit because the door would not unlock.

212.   The control room operator attempted to unlock the main door, but the locking mechanism failed.

213.   The rescuers then had to send an officer to locate a supervisor with a key to open the Main Door.

214.   Throughout this time, the inmates continued their attack on Tim.

215.   Ultimately a supervisor with a key was able to unlock the main door and the rescuers were able to subdue the inmates and save Tim.

216.   Incredibly, the problems with the locks throughout the Cimarron Unit were well known to Defendants Warden Schroeder, Deputy Warden Pacheco, Assistant Deputy Warden Hensley, and Chief of Security Childeree.

217.   Yet, Defendants Warden Schroeder, Deputy Warden Pacheco, Assistant Deputy Warden Hensley, and Chief of Security Childeree failed to take appropriate action, or any action, to address the faulty equipment, including the locks.

218.   The lack of proper staffing levels for the Cimarron Unit, and the fact that the equipment and fixtures were left in disrepair and inoperable, created an obvious unsecure and dangerous environment.

219.   The existence of such an obvious unsecure and dangerous environment was well-known by Defendants Warden Schroeder, Deputy Warden Pacheco, Assistant Deputy Warden Hensley, and Chief of Security Childeree.

220.   Defendants Warden Schroeder, Deputy Warden Pacheco, Assistant Deputy Warden Hensley, and Chief of Security Childeree each contributed to the creation of this obvious unsecure and dangerous environment and were deliberately indifferent to Tim's rights when they made the decision to operate the Cimarron Unit while staffed only with one floor officer, and with equipment and fixtures that were known to be faulty, defective, and inoperable.

221.   As a result of Defendant Warden Schroeder's, Deputy Warden Pacheco, Assistant Deputy Warden Hensley's, and Chief of Security Childeree's deliberate indifference to Tim's rights, this created an opportunity for inmates, which they otherwise would not have had, to attack Tim.

222.   As a result of that attack, Tim has suffered and continues to suffer from significant, debilitating, and permanent physical and emotional injuries, including a broken nose, a lacerated lip that had to be repaired by a plastic surgeon, a concussion, and bruising on his head and body. Tim is still being treated for Post-Traumatic Stress Disorder, anxiety, insomnia, cognitive and memory problems, and migraine and tension headaches as a result.

223.   Tim has not been able to return to work since his attack in June 2014.

## CORRECTIONAL SERGEANT ARMANDO SALAZAR

224.   At the time of his assault, Plaintiff Armando Salazar ("Armando") had been employed with ADC for approximately 8 years at ASPC Tucson.

225.   Armando had been promoted to Sergeant and had also been accepted into ADC's Special Security Unit ("SSU").

226.   Among other duties, SSU officers are responsible for identifying and verifying inmate gang members and investigating inmate misconduct.

227.   Due to staffing shortages, on October 22, 2015, Armando was not in his SSU role, but was mandated to work in the main control room of the Cimarron Unit.

228.   This was the first time that Armando had ever worked as an officer in the Cimarron Unit.

229.   An inmate on inmate assault occurred.

230.   The shift commander, Defendant Keefe, telephoned Armando to convey instructions from Defendant ADW Josefowicz that Armando resume his SSU duties and interview the inmates involved in the earlier assault.

231.   Because of the staffing shortages, ADC employees are under standing orders to report any duty changes to their supervisors.   Armando telephoned his SSU supervisor who acknowledged the duty change.

232.   After being relieved by another officer, Armando went to Defendant ADW Josefowicz to confirm the duty change.   Defendant ADW Josefowicz told Armando that the change of duty was authorized because Defendant Warden Ramos himself had approved the inmate interviews.

233.   Defendant Lt. Ritchie was present during Armando's conversation with ADW Josefowicz.

234.   Defendant Lt. Ritchie told Armando that he would go with Armando and help him.

235.   As the two approached the Cimarron Unit door, Defendant Lt. Ritchie did not enter, and upon information and belief, remained outside to smoke a cigarette.

236.   Armando entered the cell block and went to the inmate's cell.

237.   Armando advised the inmate that he was going to escort him to another area for an interview.

238.   Armando then motioned to the control officer to unlock the cell door.

239.   As the door opened the inmate attacked Armando, striking him in the head and attempting to push Armando into the cell.

240.   Armando grappled with the inmate, attempting to gain control, while moving out of the cell.

1    241.    Another inmate, already outside of his cell, joined in the attack.

2    242.    Two officers came to Armando's aid and tried to gain control of the inmates.
3    Armando and the two officers very nearly had the situation under control when they suddenly
4    noticed inmates *opening their own cell doors* to join in the attack.

5    243.    One of the responding officers was knocked unconscious and fell to the floor,
6    while the other was being choked.

7    244.    Armando fought for his life against an onslaught of inmates.  The inmates broke
8    Armando's wrist and continued to kick, stomp and punch him.

9    245.    The control room officer sounded the alarm and additional officers rushed to the
10   scene.

11   246.    The additional officers used OC spray to halt the attack and forced the inmates to
12   lie down on floor.

13   247.    Armando was bleeding and obviously severely injured.

14   248.    In spite of his injuries, Armando went back to make sure that all of the officers
15   involved were safely out of harm's way.

16   249.    Armando remains off-duty and is not expected to fully recover from his injuries
17   until April or May of 2016.

18   250.    The ADC has known for several years that inmates tamper with the cell door locks
19   by jamming trash or other obstructions into the locks. The effect of such tampering is that the
20   doors do not lock and inmates can open their cell doors, freely, at any time.

21   251.    Defendants Ramos, Stemple, Josefowicz, Ritchie and other supervisors had
22   specific knowledge that inmates were able to open their locked cell doors.

23   252.    Defendant Ramos knew about the risks and dangers because, at least two months
24   prior to Armando's assault, a representative from the Correctional Officer Association
25   personally met with Defendant Ramos and told him that the inmates in the Cimarron Unit could
26   open their cell doors.

27   253.    During that meeting, the representative asked Defendant Ramos when repairs
28   would be initiated.

254. Defendant Ramos told the representative that he had already been aware that inmates could open their cell doors and that he had personally inspected the Cimarron Unit.

255. Defendant Ramos then stated that he had instructed Defendant ADW Josefowicz to have the doors checked and inmates written up for tampering.

256. During that same meeting, the representative for the Correctional Officer Association told Defendant Ramos that no one had ever warned the officers working in the Cimarron Unit that the cell locks were not functioning properly, or ever even instructed the officers to check locks for inmate tampering.

257. Defendant Ritchie was also well aware that that the cell door locks were tampered with or otherwise malfunctioning. This is because, several months prior to Armando's assault, the graveyard Lieutenant personally met with Defendant Ritchie and told Defendant Ritchie about flashing red lights on the door operation panels in the control room.

258. The flashing red lights on the door operation panels indicate that the inmate cell doors were not secure.

259. In that same meeting, Defendant Ritchie was also told that the graveyard Lieutenant had submitted work orders for every flashing red light but no action had been taken to repair the locks.

260. Two weeks before Armando was attacked, Defendant Ritchie noticed seven flashing red lights on the door operations panel inside the Cimarron Unit control room.

261. After observing the flashing red lights, Defendant Ritchie then advised that a second work order needed to be submitted for the same locks that were causing the flashing red lights when the graveyard Lieutenant had reported the issue months before.

262. Defendants Ramos, Stemple, Josefowicz, Ritchie and other supervisors failed to implement policies to warn officers and failed to implement policies directing officers to search for tampered locks.

263. Despite the fact that Defendants Ramos, Stemple, Josefowicz, Ritchie and other supervisors knew that inmates could open their own cell doors, they did not take any action to repair the locks.

264. Despite the fact that Defendants Ramos, Stemple, Josefowicz, Ritchie and other supervisors knew that inmates could open their cell doors, none of the Defendants informed the corrections officers, including Armando, that the inmates in the Cimarron Unit could open their own locked cell doors.

265. The fact that the ADC and Defendants Ramos, Stemple, Josefowicz, Ritchie and other supervisors had knowledge of the risks and dangers inherent when inmates can open their cell doors and had not warned staff presented a significant obvious danger to corrections officers, including Armando, and placed every corrections officer at risk for serious bodily harm or worse.

266. Defendants Ramos, Stemple, Josefowicz and Ritchie each contributed to the creation of this obvious unsecure and dangerous environment and were deliberately indifferent to Armando's rights when they made the decision to operate the Cimarron Unit with equipment and fixtures, including locks, that were known to be faulty and/or defective, and yet without hid the defective locks and the significant danger posed by inmates who could freely leave their cells.

267. As a result of the deliberate indifference of Defendants Ramos, Stemple Josefowicz, and Ritchie, the opportunity to attack Armando was created which otherwise would not have existed.

268. As a result of the attack, Armando suffered serious physical and emotional injuries, including a broken wrist, concussion and head injuries.

**CORRECTIONS OFFICER SUSETTE KOHLER**

269. Plaintiff Susette Kohler ("Susette") began working as a correctional officer at the ASPC Yuma in the Dakota Unit in 1998.

270. Susette transferred to other units at ASPC Yuma, but returned to the Dakota Unit as a COIII in 2014.

271. As a COIII, Susette serves as a counselor and case worker for inmates in the Dakota Unit. Her duties include annual inmate reviews, reclassification reviews, inmate screenings, audit filing, and researching and addressing inmate grievances.

272.   Due to the number of duties that the COIIIs perform, and for safety reasons, at least two COIIIs are scheduled in each building.

273.   The Dakota Unit was, however, routinely short of COIIIs.

274.   In addition to the numerous duties described herein, Susette was often required to serve in the capacity of a COII.  This is because the Dakota Unit regularly experiences staffing shortages.

275.   Such staffing shortages are routine within the ADC, including the Dakota Unit, and are well known to Defendants Warden Laura Escapule, Deputy Warden Rose Sanders, Chief of Security Captain John Doe Carol, and COIV Laura Pyle.

276.   In addition to the staffing shortages, Susette and the other employees at the Dakota Unit had discovered that there were not enough working batteries for the radios that were assigned out each day.

277.   Susette had, in fact, told Defendant Sanders about her concerns with the batteries. Specifically, Susette expressed her concern that there were not enough batteries for each corrections officer to have a working radio, just days before her assault.

278.   Defendant Sanders told Susette that she would investigate the batteries, but did not otherwise change the protocols or procedures for the radios.

279.   The Dakota Unit is a close-custody yard, housing Level-4 and Level-5 offenders. Due to the violent nature of the inmates in a close-custody yard, all inmate movement is restricted and inmates are not permitted to be escorted without a guard.

280.   Through the mid-2000's and prior to her brief departure from the Dakota Unit, whenever there was a staffing shortage the yard would be "closed," meaning that inmate movement would be minimal. Put another way, in a "closed" yard, the inmates would not be sent out to recreation and would be fed meals in their cells instead of the dining building.

281.   Upon her return to the Dakota Unit in 2014, the yard was never "closed" when there were staffing shortages.

282.   During staffing shortages, there are routinely not enough corrections officers to safely accompany inmate movement.   As a result, instead of following the policies and

procedures required to manage inmate movement in a Level-4 close-custody unit, the corrections officers at the Dakota Unit contact the guard in the tower to request that the tower guard make and keep visual contact on any and all inmates that are in the recreation yard, or inmates who are moving between housing, medical, administration or dining buildings.

283.   In or around March 2015, COIII Olivera was promoted to COIII and began working in Building 6 alongside another COIII.

284.   Shortly thereafter, the other COIII was transferred to the next yard, leaving COIII Olivera alone in Building 6.

285.   In or around March 2015, Susette was informed by COIV Pyle that the only other counselor, COIII Diaz, would be moved to Building 6 to work with COIII Olivera.

286.   COIV Pyle told Susette that COIII Diaz was moved so that COIII Olivera would not be alone in Building 6.

287.   Of course, the effect of this was that Susette would be left to work alone and be responsible for approximately 150 inmates housed in Building 7.

288.   The fact that Susette would be assigned to work alone in Building 7 was well known to Defendants Escapule, Sanders, John Doe Carol and COIV Pyle.

289.   At approximately 8:45 a.m. on April 13, 2015, Susette called the control room for Building 7 and informed them that Inmate Fernandes Masters, a Level 5 inmate, had a legal call scheduled at 9:00 a.m.

290.   The control room responded to Susette, informing her that the control room was not ready yet and that they would call Susette back shortly. The control room did not tell Susette that Inmate Masters was en route to her office in Building 7.

291.   Inmate Masters is a Level-5 inmate who was convicted of the brutal murder of his step-father where he murdered his step-father in order to steal his cell phone and car. Inmate Masters was sentenced to life in prison.

292.   In addition to the heinous crimes that resulted in his life sentence, Inmate Masters had three additional documented incidents of sexual misconduct while in prison.  Specifically, in 2013, Inmate Masters was caught twice exposing himself to staff during informal count.  In

2014, Inmate Masters verbally assaulted a female COII by asking sexually inappropriate questions.

293.   The fact that Inmate Masters was not only dangerous, but also known for his sexually inappropriate conduct toward staff members was well known to the Defendants.

294.   At approximately 9:00 a.m., Inmate Masters appeared, without an escort, at Susette's office in Building 7.

295.   Susette opened the door and let Inmate Masters into the office.

296.   Susette then attempted to make Inmate Masters' legal call, however, the receiving party did not answer.

297.   Susette turned to tell Inmate Masters that the call could not be completed.

298.   Before Susette could tell Masters about the call, he quickly closed Susette's office door, locking both of them in the office.

299.   Inmate Masters then proceeded to climb over Susette's desk and jumped on top of her.  He grabbed her by the neck and threw her to the floor.

300.   Once Susette was on the floor, Inmate Masters proceeded to climb on top of Susette.  He placed his hand over her mouth and told her "if you yell, I will kill you."

301.   Inmate Masters then reached into her blouse, ripped her tank top and began kissing her breast.

302.   Inmate Masters then began kissing Susette on the lips.

303.   Inmate Masters then reached down and pulled his and Susette's pants down.

304.   She reached for her radio to call for help. However, the radio did not work.

305.   The control room for Building 7 is upstairs on the second floor.  Having heard noises from downstairs, COII Ortega ordered the other COII in the control room to check on Susette's location.

306.   Upon reaching Susette's office and seeing the sexual assault in progress, the responding corrections officer initiated an ICS and began the process of apprehending Inmate Masters.

307.   Inmate Masters subsequently admitted to the sexual assault and was sentenced to an additional 11.25 years on top of his life sentence in the custody of the ADC.

308.   The fact that Susette was expected to meet and work with dangerous Level-5 offenders while assigned to an office that was not only isolated, but was the only office in Building 7, created an obvious unsecure and dangerous environment for Susette that provided Inmate Masters with an opportunity to attack her which would otherwise have not existed.

309.   The existence of such an obvious unsecure and dangerous environment was well-known by Defendants Warden Escapule, Deputy Warden Sanders, Chief of Security Carol, and COIV Laura Pyle.

310.   Defendants Warden Escapule, Deputy Warden Rose Sanders, Chief of Security Captain John Doe Carol, and COIV Laura Pyle each contributed to the creation of this obvious unsecure and dangerous environment and were deliberately indifferent to Susette's rights when they made the decision to assign Susette to work with Level-5 offenders alone, in her office in Building 7, where she would be the only ADC employee on the floor.

311.   As a result of Defendants' Warden Escapule, Deputy Warden Sanders, Chief of Security Carol, and COIV Laura Pyle's deliberate indifference to Susette's rights, the opportunity for Inmate Masters to attack Susette was created which would have otherwise not existed.

312.   As a result of that attack, Susette has and continues to suffer significant, debilitating, and permanent physical and emotional traumatic injuries.

313.   As a result of the assault, Susette suffered contusions and bruising all over her body.   In addition to her physical injuries, Susette is being treated for anxiety, depression, nightmares, and requires medication in order to sleep.

314.   As a result of her physical and psychological injuries, Susette is no longer able to work with or near inmates. She has had to change her role with the ADC, working at the Unit office rather than in a prison facility with inmates.

## CORRECTIONS OFFICER RICARDO ACOSTA

315.    Plaintiff Ricardo Acosta ("Ricardo") has been working as a correctional officer at the ASPC Tucson facility for nine years.

316.    In 2015, Ricardo was assigned work at ASPC Tucson's Santa Rita Unit.

317.    The Santa Rita Unit housed dangerous inmates who were classified as posing serious threats to the safe and orderly operation of the institution.

318.    The Santa Rita Unit is required to operate with a staff of two floor officers.

319.    The Santa Rita Unit, however, is routinely short staffed and often operates with only a single floor officer.

320.    Short staffing exposes the floor officer to a heightened risk of assault by inmates.

321.    Such staffing shortages are routine throughout the ADC, including the Santa Rita Unit.

322.    It was also well known to supervisors Defendants Warden Alfred Ramos, DW John McAdorey, and other supervisors, that the Santa Rita Unit was routinely short staffed. Upon information and belief, these supervisors condoned the practice of operating the Santa Rita Unit with insufficient staff, and were well aware that this practice exposed Corrections Officers to an unacceptable risk of harm.

323.    In addition to routine short staffing, the cell door locks in the Santa Rita Unit were defective and could be opened by inmates with minimal effort.

324.    Defendants Ramos, McAdorey, and other supervisors were aware that, for years, inmates could easily open the cell doors in the Santa Rita Unit.

325.    Upon information and belief, Defendants Ramos, McAdorey, and other supervisors failed to take appropriate corrective action to repair the locks on the Santa Rita Unit cell doors.

326.    On May 12, 2015, Ricardo was working in the Santa Rita Unit.  He placed an inmate on report for disruptive behavior.

327.    The next morning, Ricardo was back in the Santa Rita Unit.

328. The Santa Rita Unit was short staffed and Ricardo was working as the sole floor officer.

329. Ricardo was opening individual cell doors to turn the inmates out for breakfast.

330. As Ricardo was opening a cell door he heard an inmate yell, "You know what Acosta, you can take that ticket and shove it up your ass!"

331. As Ricardo turned to see who was yelling, he saw an inmate rushing him.

332. The inmate had opened his own cell door to attack Ricardo.

333. Before Ricardo could defend himself, the inmate swung at Ricardo, striking him in the temple and left cheek bone.

334. Ricardo was staggered by the punch.

335. Because he was the only officer in the Unit, Ricardo was forced to defend himself.

336. Ricardo gathered himself and was able to punch the inmate before the inmate could strike a second time.

337. In defending himself, Ricardo's fingers and knuckles caught the inmate's mouth.

338. As a result, both Ricardo's hand and the inmate's mouth bled profusely.

339. After other officers arrived to calm the situation, Ricardo learned that the inmate was both HIV positive and Hepatitis C positive.

340. Fearing transmission of those viruses, Ricardo went to the emergency room for treatment.

341. At the hospital, Ricardo was treated with the Post-Exposure Prophylaxis ("PEP") protocol for HIV exposure.

342. Ricardo became ill with nausea and vomiting, well known side effects of the PEP protocol.

343. Ricardo advised the ADC that he had a worker's compensation injury and sought to stay off work during the PEP course.

344. The ADC denied Ricardo's worker's compensation claim.

345. The ADC advised Ricardo that his claim would only be recognized if he tested positive for HIV or Hepatitis C.

346. Even though he was sick with the side effects of the PEP, Ricardo returned to work because he lacked sufficient sick time to remain home.

347. Ricardo routinely undergoes HIV and Hepatitis C testing and, to date, remains uninfected.

348. Short staffing, especially when combined with defective locks, creates an obvious unsecure and dangerous environment for corrections officers.

349. The existence of such an obvious unsecure and dangerous environment was well-known by Defendants Warden Alfred Ramos, DW John McAdorey, and other supervisors.

350. Defendants Warden Ramos, Deputy Warden John McAdorey, and other supervisors each contributed to the creation of this obvious unsecure and dangerous environment and were deliberately indifferent to Ricardo's rights when they made the decision to operate the Santa Rita Unit with Ricardo as the sole floor officer.

351. As a result of Defendants' Warden Ramos, Deputy Warden McAdorey, and other supervisors' indifference to Ricardo's rights, the opportunity for the inmate to attack Ricardo was created which other otherwise would not have existed.

352. As a result of that attack, Ricardo suffered and continues to suffer from physical injuries, including a bruised and swollen head and face, cuts on his hand, and significant emotional injuries relating to his fear and uncertainty over his exposure to HIV and Hepatitis C.

## CORRECTIONS OFFICER EDUARDO OSUNA

353. Plaintiff Eduardo Osuna ("Eduardo") has been working as a correctional officer at the ASPC Tucson facility for three years.

354. In 2013, Eduardo was assigned to work at ASPC Tucson's Cimarron Unit.

355. The Cimarron Unit housed dangerous inmates who were classified as posing serious threats to the safe and orderly operation of the institution.

356. The Cimarron Unit was required to operate with a staff of two yard officers.

357. The Cimarron Unit, however, was routinely short staffed and often operated with only a single yard officer.

358. Short staffing exposes the floor officer to a heightened risk of assault by inmates.

1   359.   Such staffing shortages are routine throughout the ADC, including the Cimarron

2   Unit.

3   360.   It was also well known to supervisors Defendants Warden Alfred Ramos, DW

4   Pacheco, and other supervisors, that the Cimarron Unit was routinely short staffed.   Upon

5   information and belief, these supervisors condoned the practice of operating the Cimarron Unit

6   with insufficient staff and were well aware that this practice exposed the Corrections Officers to

7   an unacceptable risk of harm

8   361.   In addition to routine short staffing, certain cell door locks in the Cimarron Unit

9   were broken in such a way that they could not be remotely opened by the Cimarron Unit control

10   room officer.

11   362.   Instead, officers had to use keys to open the doors on the cells with broken locks.

12   363.   When an officer used keys to open a door to put an inmate back inside a cell, the

13   officer's attention was diverted from the inmate to the lock.   This created a dangerous situation

14   that allowed inmates to attack officers, essentially while their backs were turned.

15   364.   This danger was heightened by the ADC's staff shortage.   Where two officers were

16   needed to safely open the cell door with a key, ADC often simply sent a single officer, knowingly

17   exposing that officer to heightened risk of attack.

18   365.   One of the cells with a broken lock is cell number 1-C-22.

19   366.   Eduardo is well aware that, prior to his incident, the ADC staff had submitted

20   multiple repair requests for the lock on cell 1-C-22.

21   367.   Upon information and belief, Defendants Ramos, Pacheco, and other supervisors

22   failed to take appropriate corrective action to repair the Cimarron Unit cell door locks and, in

23   spite of the multiple requests, the 1-C-22 was never repaired.

24   368.   On June 6, 2015 Eduardo was working as a floor officer in the Cimarron Unit.   An

25   inmate engaged Eduardo in a verbal exchange.   As a result, the inmate was escorted to another

26   unit for an interview.   This inmate was housed in cell 1-C-22.

27   369.   On this day, the Cimarron Unit was short staffed with only a single yard officer.

28

370.   At normal and safe staffing levels, one of the two yard officers would have been tasked with retrieving the inmate from his interview.

371.   Because only a single yard officer was on duty, Eduardo was ordered to retrieve the inmate.

372.   Eduardo escorted the inmate from the interview room to cell 1-C-22.

373.   All of the other inmates in the cell block were locked down.

374.   Eduardo and the inmate approached 1-C-22.

375.   Because the cell door lock was broken and could not be remotely opened from the control room, Eduardo had to use a key to open the door.

376.   As Eduardo inserted the key into the 1-C-22 lock, his attention was momentarily diverted from the inmate.

377.   The inmate seized on this opportunity to punch Eduardo in head.

378.   The unexpected blow knocked Eduardo unconscious and he fell to the floor.

379.   The inmate then began kicking Eduardo in the head and ribs.

380.   The control room officer saw the attack and called for assistance.

381.   The inmate was quickly subdued.

382.   Eduardo suffered a fractured eye orbital, cracked ribs and lacerations and bruises.

383.   The broken lock, especially when combined with short staffing, creates an obvious unsecure and dangerous environment for corrections officers.

384.   The existence of such an obvious unsecure and dangerous environment was well-known by Defendants Ramos, Pacheco, and other supervisors.

385.   Defendants Ramos, Pacheco, and other supervisors each contributed to creation of this obvious unsecure and dangerous environment and were deliberately indifferent to Eduardo's rights when they made the decision to operate Cimarron with broken locks and without sufficient staff.

386.   As a result of Defendants' Ramos, Pacheco, and other supervisors' indifference to Eduardo's rights, the opportunity for the inmate to attack Eduardo was created which would have otherwise not existed.

387.   Eduardo has returned to work to the Cimarron Unit.

388.   It has been nearly a year since Eduardo was attacked and the 1-C-22 lock has still not been repaired.  1-C-22 can only be opened manually, with a key.

**CLAIMS FOR RELIEF**
**COUNT ONE**
**VIOLATION OF CIVIL RIGHTS – 42 U.S.C. §1983**
**(Christopher Russett Against Defendants Fizer, Morris, Curtis, Smith and Doe Defendants)**

389.   Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth here.

390.   At all relevant times, Defendants Fizer, Morris, Curtis, Smith, and Does were acting under the color of law.

391.   The United States Constitution guarantees Christopher the right to maintain the integrity of his own body.

392.   The Fourteenth Amendment to the United States Constitution precludes those acting under the color of law from depriving Christopher of the rights guaranteed to him by the United States Constitution, including the right to maintain the integrity of his body without due process of law.

393.   As set forth above, Defendants Fizer, Morris, Curtis, Smith, and Does individually and collectively created obvious and well known dangerous conditions that, but for the acts and omissions of Defendants Fizer, Morris, Curtis, Smith, and Does, would not have existed and to which Christopher would not have been subjected.

394.   The danger of said conditions was obvious and known by Defendants Fizer, Morris, Curtis, Smith, and Does.

395.   Defendants Fizer, Morris, Curtis, Smith, and Does had a duty and obligation to protect Christopher, and Christopher relied on Defendants Fizer, Morris, Curtis, Smith, and Does to protect him.

396.   Yet, Defendants Fizer, Morris, Curtis, Smith, and Does did nothing to ameliorate the danger to which Christopher was exposed or to otherwise protect him and keep him safe, as set forth in substantial detail above.

397.   In creating the dangerous conditions to which Christopher was exposed, and in failing to take any steps to ameliorate the danger, or to otherwise protect Christopher, Defendants Fizer, Morris, Curtis, Smith, and Does acted with deliberate indifference to Christopher's right to maintain the integrity of his body, and other rights guaranteed to him by the United States Constitution, including the Fourteenth Amendment.

398.   As a direct and proximate result of Defendants Fizer, Morris, Curtis, Smith, and Does deliberate indifference, Christopher sustained traumatic physical and emotional injuries that he struggles with to this day, as set forth above in substantial detail above.

399.   Consequently, Defendants Fizer, Morris, Curtis, Smith, and Does violated the due process rights guaranteed to Christopher by the Fourteenth Amendment of the United States Constitution.

400.   The acts and omissions of Defendants Fizer, Morris, Curtis, Smith, and Does were of such a nature as to entitle Christopher to an award of exemplary and punitive damages to punish the wrongful conduct alleged herein, and to deter such conduct in the future.

401.   Further, pursuant to 42 U.S.C. § 1988, Christopher is entitled to an award of his incurred attorneys' fees and costs.

**COUNT TWO**
**VIOLATION OF CIVIL RIGHTS – 42 U.S.C. §1983**
**(David Holder Against Defendants Moody, John Doe Chief of Security, John Doe Shift Commander, Ramirez, Pizanno, and Doe Defendants)**

402.   Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth here.

403.   At all relevant times, Defendants Moody, John Doe Chief of Security, John Doe Shift Commander, Ramirez, Pizanno, and Does were acting under color of law.

404.   The United States Constitution guarantees David the right to maintain the integrity of his own body.

405.   The Fourteenth Amendment to the United States Constitution precludes those acting under color of law from depriving David of the rights guaranteed him by the United States Constitution, including the right to maintain the integrity of his body without due process of law.

406.   As set forth above, Defendants Moody, John Doe Chief of Security, John Doe Shift Commander, Ramirez, Pizanno, and Does individually and collectively created obvious and well known dangerous conditions that, but for the acts and omissions of Defendants Moody, John Doe Chief of Security, John Doe Shift Commander, Ramirez, Pizanno, and Does, would not have existed and to which David would not have been subjected.

407.   The danger of said conditions was obvious and known by Defendants Moody, John Doe Chief of Security, John Doe Shift Commander, Ramirez, Pizanno, and Does.

408.   Defendants Moody, John Doe Chief of Security, John Doe Shift Commander, Ramirez, Pizanno, and Does had a duty and obligation to protect David, and David relied on Defendants Moody, John Doe Chief of Security, John Doe Shift Commander, Ramirez, Pizanno, and Does to protect him.

409.   Yet, Defendants Moody, John Doe Chief of Security, John Doe Shift Commander, Ramirez, Pizanno, and Does did nothing to ameliorate the danger to which David was exposed or to otherwise protect him and keep him safe as set forth in substantial detail above.

410.   In creating the dangerous conditions to which Plaintiffs were exposed, and in failing to take any steps to ameliorate the danger or otherwise protect David, Defendants Moody, John Doe Chief of Security, John Doe Shift Commander, Ramirez, Pizanno, and Does acted with deliberate indifference to David's right to maintain the integrity of his body and other rights guaranteed to him by the United States Constitution, including the Fourteenth Amendment.

411.   As a direct and proximate result of Defendants Moody, John Doe Chief of Security, John Doe Shift Commander, Ramirez, Pizanno, and Does' deliberate indifference, David sustained traumatic physical and emotional injuries that he struggles with to this day, as set forth above in substantial detail above.

41

412.   Consequently, Defendants Moody, John Doe Chief of Security, John Doe Shift Commander, Ramirez, Pizanno, and Does violated the due process rights guaranteed to David by the Fourteenth Amendment of the United States Constitution.

413.   The acts and omissions of Defendants Moody, John Doe Chief of Security, John Doe Shift Commander, Ramirez, Pizanno, and Does were of such a nature as to entitle David to an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

414.   Further, pursuant to 42 U.S.C. § 1988, David is entitled to an award of his incurred attorneys' fees and costs.

### COUNT THREE
### VIOLATION OF CIVIL RIGHTS – 42 U.S.C. §1983
### (Desiree Knighton Against Defendants Moody, Hibbard, Lunka, and Doe Defendants)

415.   Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth here.

416.   At all relevant times, Defendants Moody, Hibbard, Lunka, and Doe Defendants were acting under the color of law.

417.   The United States Constitution guarantees Desiree the right to maintain the integrity of her own body.

418.   The Fourteenth Amendment to the United States Constitution precludes those acting under the color of law from depriving Desiree of the rights guaranteed to her by the United States Constitution, including the right to maintain the integrity of her body without due process of law.

419.   As set forth above, Defendants Moody, Hibbard, Lunka, and Doe Defendants individually and collectively created obvious and well known dangerous conditions that, but for the acts and omissions of Defendants Moody, Hibbard, Lunka, and Doe Defendants, would not have existed and to which Desiree would not have been subjected.

420.   The danger of said conditions was obvious and known by Defendants Moody, Hibbard, Lunka, and Doe Defendants.

421.   Defendants Moody, Hibbard, Lunka, and Doe Defendants had a duty and obligation to protect Desiree, and Desiree relied on Defendants Moody, Hibbard, Lunka, and Doe Defendants to protect her.

422.   Yet, Defendants Moody, Hibbard, Lunka, and Doe Defendants did nothing to ameliorate the danger to which Desiree was exposed or to otherwise protect her and keep her safe, as set forth in substantial detail above.

423.   In creating the dangerous conditions to which Desiree was exposed and in failing to take any steps to ameliorate the danger or to otherwise protect Desiree, Defendants Moody, Hibbard, Lunka, and Doe Defendants acted with deliberate indifference to Desiree's right to maintain the integrity of her body and other rights guaranteed to her by the United States Constitution, including the Fourteenth Amendment.

424.   As a direct and proximate result of Defendants Moody, Hibbard, Lunka, and Doe Defendants' deliberate indifference, Desiree sustained traumatic physical and emotional injuries that she struggles with to this day, as set forth above in substantial detail above.

425.   Consequently, Defendants Moody, Hibbard, Lunka, and Doe Defendants violated the due process rights guaranteed to Desiree by the Fourteenth Amendment of the United States Constitution.

426.   The acts and omissions of Defendants Moody, Hibbard, Lunka, and Doe Defendants were of such a nature as to entitle Desiree to an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

427.   Further, pursuant to 42 U.S.C. § 1988, Desiree is entitled to an award of her incurred attorneys' fees and costs.

## COUNT FOUR
### VIOLATION OF CIVIL RIGHTS – 42 U.S.C. §1983
#### (Doug Schuster Against Defendants Moody and Doe Defendants)

428.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth here.

429.    At all relevant times, Defendant Moody and Doe Defendants were acting under the color of law.

430.    The United States Constitution guarantees Doug the right to maintain the integrity of his own body.

431.    The Fourteenth Amendment to the United States Constitution precludes those acting under the color of law from depriving Doug of the rights guaranteed to him by the United States Constitution, including the right to maintain the integrity of his body without due process of law.

432.    As set forth above, Defendant Moody and Doe Defendants individually and collectively created obvious and well known dangerous conditions that, but for the acts and omissions of Defendant Moody and Doe Defendants, would not have existed and to which Doug would not have been subjected.

433.    The danger of said conditions was obvious and known by Defendant Moody and Doe Defendants.

434.    Defendant Moody and Doe Defendants had a duty and obligation to protect Doug, and Doug relied on Defendant Moody and Doe Defendants to protect him.

435.    Yet, Defendant Moody and Doe Defendants did nothing to ameliorate the danger to which Doug was exposed or to otherwise protect him and keep him safe, as set forth in substantial detail above.

436.    In creating the dangerous conditions to which Doug was exposed, and in failing to take any steps to ameliorate the danger or to otherwise protect Doug, Defendant Moody and Doe Defendants acted with deliberate indifference to Doug's right to maintain the integrity of his

body and other rights guaranteed to him by the United States Constitution, including the Fourteenth Amendment.

437.    As a direct and proximate result of Defendant Moody and Doe Defendants' deliberate indifference, Doug sustained traumatic physical and emotional injuries that he struggles with to this day, as set forth above in substantial detail above.

438.    Consequently, Defendant Moody and Doe Defendants violated the due process rights guaranteed to Doug by the Fourteenth Amendment of the United States Constitution.

439.    The acts and omissions of Defendant Moody and Doe Defendants were of such a nature as to entitle Doug to an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

440.    Further, pursuant to 42 U.S.C. § 1988, Doug is entitled to an award of his incurred attorneys' fees and costs.

### COUNT FIVE
### VIOLATION OF CIVIL RIGHTS – 42 U.S.C. §1983
### (Tim Baca Against Defendants Schroeder, Hensley, Pacheco, and Doe Defendants)

441.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth here.

442.    At all relevant times, Defendants Schroeder, Hensley, Pacheco, and Does were acting under the color of law.

443.    The United States Constitution guarantees Tim the right to maintain the integrity of his own body.

444.    The Fourteenth Amendment to the United States Constitution precludes those acting under the color of law from depriving Tim of the rights guaranteed to him by the United States Constitution, including the right to maintain the integrity of his body without due process of law.

445.    As set forth above, Defendants Schroeder, Hensley, Pacheco, and Does individually and collectively created obvious and well known dangerous conditions that, but for

the acts and omissions of Defendants Schroeder, Hensley, Pacheco, and Does, would not have existed and to which Tim would not have been subjected.

446.   The danger of said conditions was obvious and known by Defendants Schroeder, Hensley, Pacheco, and Does.

447.   Defendants Schroeder, Hensley, Pacheco, and Does had a duty and obligation to protect Tim, and Tim relied on Defendants Schroeder, Hensley, Pacheco, and Does to protect him.

448.   Yet, Defendants Schroeder, Hensley, Pacheco, and Does did nothing to ameliorate the danger to which Tim was exposed or to otherwise protect him and keep him safe, as set forth in substantial detail above.

449.   In creating the dangerous conditions to which Tim was exposed, and in failing to take any steps to ameliorate the danger or otherwise protect Tim, Defendants Schroeder, Hensley, Pacheco, and Does acted with deliberate indifference to Tim's right to maintain the integrity of his body and other rights guaranteed to him by the United States Constitution, including the Fourteenth Amendment.

450.   As a direct and proximate result of Defendants Schroeder, Hensley, Pacheco, and Does' deliberate indifference, Tim sustained traumatic physical and emotional injuries that he struggles with to this day, as set forth above in substantial detail above.

451.   Consequently, Defendants Schroeder, Hensley, Pacheco, and Does violated the due process rights guaranteed to Tim by the Fourteenth Amendment of the United States Constitution.

452.   The acts and omissions of Defendants Schroeder, Hensley, Pacheco, and Does were of such a nature as to entitle Tim to an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

453.   Further, pursuant to 42 U.S.C. § 1988, Tim is entitled to an award of his incurred attorneys' fees and costs.

**COUNT SIX**
**VIOLATION OF CIVIL RIGHTS – 42 U.S.C. §1983**
**(Armando Salazar Against Defendants Schroeder, Josefowicz, Stemple, Ritchie, and Doe Defendants)**

454.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth here.

455.    At all relevant times, Defendants Schroeder, Josefowicz, Stemple, Ritchie, and Does were acting under the color of law.

456.    The United States Constitution guarantees Armando the right to maintain the integrity of his own body.

457.    The Fourteenth Amendment to the United States Constitution precludes those acting under the color of law from depriving Armando of the rights guaranteed to him by the United States Constitution, including the right to maintain the integrity of his body without due process of law.

458.    As set forth above, Defendants Schroeder, Josefowicz, Stemple, Ritchie, and Does individually and collectively created obvious and well known dangerous conditions that, but for the acts and omissions of Defendants Schroeder, Josefowicz, Stemple, Ritchie, and Does, would not have existed and to which Armando would not have been subjected.

459.    The danger of said conditions was obvious and known by Defendants Schroeder, Josefowicz, Stemple, Ritchie, and Does.

460.    Defendants Schroeder, Josefowicz, Stemple, Ritchie, and Does had a duty and obligation to protect Armando, and Armando relied on Defendants Schroeder, Josefowicz, Stemple, Ritchie, and Does to protect him.

461.    Yet, Defendants Schroeder, Josefowicz, Stemple, Ritchie, and Does did nothing to ameliorate the danger to which Armando was exposed or to otherwise protect him and keep him safe, as set forth in substantial detail above.

462.    In creating the dangerous conditions to which Armando were exposed, and in failing to take any steps to ameliorate the danger or otherwise protect Armando, Defendants

Schroeder, Josefowicz, Stemple, Ritchie, and Does acted with deliberate indifference to Armando's right to maintain the integrity of his body and other rights guaranteed to him by the United States Constitution, including the Fourteenth Amendment.

463.   As a direct and proximate result of Defendants Schroeder, Josefowicz, Stemple, Ritchie, and Does deliberate indifference, Armando sustained traumatic physical and emotional injuries that he struggles with to this day, as set forth above in substantial detail above.

464.   Consequently, Defendants Schroeder, Josefowicz, Stemple, Ritchie, and Does violated the due process rights guaranteed to Armando by the Fourteenth Amendment of the United States Constitution.

465.   The acts and omissions of Defendants Schroeder, Josefowicz, Stemple, Ritchie, and Does were of such a nature as to entitle Armando to an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

466.   Further, pursuant to 42 U.S.C. § 1988, Armando is entitled to an award of his incurred attorneys' fees and costs.

**COUNT SEVEN**
**VIOLATION OF CIVIL RIGHTS – 42 U.S.C. §1983**
**(Susette Kohler Against Defendants Escapule, Sanders, Carol, Pyle, and Doe Defendants)**

467.   Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth here.

468.   At all relevant times, Defendants Escapule, Sanders, Carol, Pyle, and Does were acting under the color of law.

469.   The United States Constitution guarantees Susette the right to maintain the integrity of her own body.

470.   The Fourteenth Amendment to the United States Constitution precludes those acting under the color of law from depriving Susette of the rights guaranteed to her by the United States Constitution, including the right to maintain the integrity of her body without due process of law.

471.   As set forth above, Defendants Escapule, Sanders, Carol, Pyle, and Does individually and collectively created obvious and well known dangerous conditions that, but for the acts and omissions of Defendants Escapule, Sanders, Carol, Pyle, and Does, would not have existed and to which Susette would not have been subjected.

472.   The danger of said conditions was obvious and known by Defendants Escapule, Sanders, Carol, Pyle, and Does.

473.   Defendants Escapule, Sanders, Carol, Pyle, and Does had a duty and obligation to protect Susette, and Susette relied on Defendants Escapule, Sanders, Carol, Pyle, and Does to protect her.

474.   Yet, Defendants Escapule, Sanders, Carol, Pyle, and Does did nothing to ameliorate the danger to which Susette was exposed or to otherwise protect her and keep her safe, as set forth in substantial detail above.

475.   In creating the dangerous conditions to which Susette was exposed, and in failing to take any steps to ameliorate the danger or otherwise protect Susette, Defendants Escapule, Sanders, Carol, Pyle, and Does acted with deliberate indifference to Susette's right to maintain the integrity of her body and other rights guaranteed her by the United States Constitution, including the Fourteenth Amendment.

476.   As a direct and proximate result of Defendants Escapule, Sanders, Carol, Pyle, and Does' deliberate indifference, Susette sustained traumatic physical and emotional injuries that she struggles with to this day, as set forth above in substantial detail above.

477.   Consequently, Defendants Escapule, Sanders, Carol, Pyle, and Does violated the due process rights guaranteed to Susette by the Fourteenth Amendment of the United States Constitution.

478.   The acts and omissions of Defendants Escapule, Sanders, Carol, Pyle, and Does were of such a nature as to entitle Susette to an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

479.   Further, pursuant to 42 U.S.C. § 1988, Susette is entitled to an award of her incurred attorneys' fees and costs.

## COUNT EIGHT
### VIOLATION OF CIVIL RIGHTS – 42 U.S.C. §1983
**(Ricardo Acosta Against Defendants Ramos, McAdorey, and Doe Defendants)**

480.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth here.

481.    At all relevant times, Defendants Ramos, McAdorey, and Does were acting under the color of law.

482.    The United States Constitution guarantees Ricardo the right to maintain the integrity of his own body.

483.    The Fourteenth Amendment to the United States Constitution precludes those acting under the color of law from depriving Plaintiff Ricardo of the rights guaranteed to him by the United States Constitution, including the right to maintain the integrity of his body without due process of law.

484.    As set forth above, Defendants Ramos, McAdorey, and Does individually and collectively created obvious and well known dangerous conditions that, but for the acts and omissions of Defendants Ramos, McAdorey, and Does, would not have existed and to which Ricardo would not have been subjected.

485.    The danger of said conditions was obvious and known by Defendants Ramos, McAdorey, and Does.

486.    Defendants Ramos, McAdorey, and Does had a duty and obligation to protect Ricardo, and Ricardo relied on Defendants Ramos, McAdorey, and Does to protect him.

487.    Yet, Defendants Ramos, McAdorey, and Does did nothing to ameliorate the danger to which Ricardo was exposed or to otherwise protect him and keep him safe, as set forth in substantial detail above.

488.    In creating the dangerous conditions to which Ricardo was exposed, and in failing to take any steps to ameliorate the danger or otherwise protect Ricardo, Defendants Ramos, McAdorey, and Does acted with deliberate indifference to Ricardo's right to maintain the

1  integrity of his body and other rights guaranteed to him by the United States Constitution,
2  including the Fourteenth Amendment.

3      489.    As a direct and proximate result of Defendants Ramos, McAdorey, and Does'
4  deliberate indifference, Ricardo sustained traumatic physical and emotional injuries that he
5  struggles with to this day, as set forth above in substantial detail above.

6      490.    Consequently, Defendants Ramos, McAdorey, and Does violated the due process
7  rights guaranteed to Ricardo by the Fourteenth Amendment of the United States Constitution.

8      491.    The acts and omissions of Defendants Ramos, McAdorey, and Does were of such
9  a nature as to entitle Ricardo to an award of exemplary and punitive damages to punish the
10 wrongful conduct alleged herein and to deter such conduct in the future.

11     492.    Further, pursuant to 42 U.S.C. § 1988, Ricardo is entitled to an award of his
12 incurred attorneys' fees and costs.

13                                **COUNT NINE**
                  **VIOLATION OF CIVIL RIGHTS – 42 U.S.C. §1983**
14      **(Eduardo Osuna Against Defendants Ramos, Pacheco, and Doe Defendants)**

15     493.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the
16 preceding paragraphs of this Complaint as if fully set forth here.

17     494.    At all relevant times, Defendants Ramos, Pacheco, and Does were acting under the
18 color of law.

19     495.    The United States Constitution guarantees Eduardo the right to maintain the
20 integrity of his own body.

21     496.    The Fourteenth Amendment to the United States Constitution precludes those
22 acting under the color of law from depriving Eduardo of the rights guaranteed to him by the
23 United States Constitution, including the right to maintain the integrity of his body without due
24 process of law.

25     497.    As set forth above, Defendants Ramos, Pacheco, and Does individually and
26 collectively created obvious and well known dangerous conditions that, but for the acts and

27

28

                                          51

omissions of Defendants Ramos, Pacheco, and Does, would not have existed and to which Eduardo would not have been subjected.

498.   The danger of said conditions was obvious and known by Defendants Ramos, Pacheco, and Does.

499.   Defendants Ramos, Pacheco, and Does had a duty and obligation to protect Eduardo, and Eduardo relied on Defendants Ramos, Pacheco, and Does to protect him.

500.   Yet, Defendants Ramos, Pacheco, and Does did nothing to ameliorate the danger to which Eduardo was exposed or to otherwise protect him and keep him safe, as set forth in substantial detail above.

501.   In creating the dangerous conditions to which Eduardo was exposed, and in failing to take any steps to ameliorate the danger or otherwise protect Eduardo, Defendants Ramos, Pacheco, and Does acted with deliberate indifference to Eduardo's right to maintain the integrity of his body and other rights guaranteed to him by the United States Constitution, including the Fourteenth Amendment.

502.   As a direct and proximate result of Defendants Ramos, Pacheco, and Does' deliberate indifference, Eduardo sustained traumatic physical and emotional injuries that he struggles with to this day, as set forth above in substantial detail above.

503.   Consequently, Defendants Ramos, Pacheco, and Does violated the due process rights guaranteed to Eduardo by the Fourteenth Amendment of the United States Constitution.

504.   The acts and omissions of Defendants Ramos, Pacheco, and Does were of such a nature as to entitle Eduardo to an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

505.   Further, pursuant to 42 U.S.C. § 1988, Eduardo is entitled to an award of his incurred attorneys' fees and costs.

**COUNT TEN**
**INJUNCTIVE RELIEF**
**(All Defendants)**

506.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

507.    Plaintiffs are entitled to a preliminary and permanent injunction directing Defendants to make immediate and permanent changes that are desperately needed to alleviate the dangerous conditions described herein.  Defendants have acted and continue acting to deprive Plaintiffs and others similarly situated of their constitutional rights by permitting dangerous conditions to exist that are contrary to sound corrections practices.

508.    Plaintiffs and others similarly situated, including other correction staff, civilian employees, inmates and the public, have suffered irreparable physical and psychological injuries and the loss of fundamental due process rights and have been and will continue to be subjected to serious risks of these same irreparable harms as the result of Defendants' policies and practices as described herein.

509.    Defendants have been and are aware of all of the conditions and deprivations complained of herein and have condoned or been intentionally indifferent to such conduct. Plaintiffs and others similarly situated have no plain, adequate, or speedy remedy at law.

510.    Without such an injunction, events similar to those described herein will continue to occur.

**COUNT ELEVEN**
**VIOLATION OF CIVIL RIGHTS – 42 U.S.C. §1983**
**(Defendants State of Arizona, Charles Ryan in his official capacity)**

511.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

512.    At all relevant times, Plaintiffs relied exclusively on Defendants in this matter and all other relevant employees of Defendant State of Arizona for their protection.

513.    Said Defendants and employees had a duty and obligation to protect Plaintiffs and Plaintiffs relied on said Defendants and employees to protect them.

514.    As to Defendants State of Arizona and Ryan, they fulfilled their duties and obligations to protect Plaintiffs by enacting and enforcing policies, procedures and practices including, without limitation, those related to sufficient staffing, proper maintenance, and overall security.

515.    Despite this, Defendants State of Arizona and Ryan failed to promulgate policies, procedures and practices that provided for sufficient staffing, proper maintenance and appropriate security and, in fact, Defendants State of Arizona and Ryan adopted, promulgated, and approved policies, procedures and practices that were deliberately indifferent to the civil rights of Plaintiffs, including, without limitation, Plaintiffs Fourteenth Amendment Rights and the right to maintain the integrity of their bodies.

516.    Said unconstitutional policies, procedures and practices proximately caused and/or contributed to the injuries sustained by Plaintiffs which are set forth above.

517.    These unconstitutional policies and practices have exposed Plaintiffs to serious harm and injury through significant under-staffing, poorly maintained facilities and unsafe conditions, as described in substantial detail above.

518.    As a direct and proximate result of Defendants' policies, practices and customs, Plaintiffs sustained traumatic physical and emotional injuries that they struggle with to this day as set forth above in substantial detail above.

519.    Defendants caused the constitutional violations suffered by the Plaintiffs and are labile for the damages suffered by Plaintiffs as a result of the policies, practices and customs that condoned and fostered the unconstitutional conduct of the individual Defendants, and were a proximate cause of the damages set forth herein.

## JURY TRIAL DEMAND

520.    Plaintiffs hereby demand a jury trial in this matter as to all claims and against all Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs requests that the Court enter judgment against the Defendants and in favor of the Plaintiffs, as follows:

A.    Preliminarily and permanently enjoin Defendants, their agents, employees, and officials from subjecting Plaintiffs and other individuals similarly situated to the unconstitutional conditions, acts, omissions, policies and practices set forth above;

B.    For compensatory, general and special damages in favor of each Plaintiff individually and against each and every Defendant, jointly and severally, in an amount to be proven at trial;

C.    For punitive and exemplary damages against Defendants in an amount appropriate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

D.    For pre-judgment and post-judgment interest to the extent provided by law;

E.    For Plaintiffs' incurred costs, including all incurred attorneys' fees and court costs, pursuant to 42 U.S.C. § 1988 and as otherwise authorized by any other statute or law;

F.    That this Court retain jurisdiction of this case until Defendants have fully complied with the orders of this Court and there is reasonable assurance that Defendants will continue to comply in the future, absent continuing jurisdiction; and

G.    For such other relief as this Court may deem proper.

**RESPECTFULLY SUBMITTED** this 9th day of May, 2016.

**BIHN & MCDANIEL, PLC**

*s/ Martin A. Bihn*
Martin A. Bihn
2600 N. Central Avenue, Suite 1775
Phoenix, Arizona 85004
*Attorney for Plaintiffs*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GOLDMAN & ZWILLINGER PLLC**

*s/ Scott H. Zwillinger*
Scott H. Zwillinger
Scott A. Griffiths
David P. Uffens
7047 E. Greenway Parkway, Suite 150
Scottsdale, Arizona 85254
*Attorney for the Plaintiffs except Schusterr*

1

**CERTIFICATE OF SERVICE**

2

3          I hereby certify that on May 9, 2016, I electronically transmitted this First Amended Complaint to the Clerk's office using the CM/ECF system for filing and transmittal of a Notice of Electronic filing to the following registrants:

4

5    Daniel P. Struck
     Rachel Love
6    Nicholas D. Acedo
7    Anne M. Orcutt
     STRUCK WIENEKE & LOVE, P.L.C.
8    3100 West Ray Road, Suite 300
9    Chandler, Arizona 85226

10

11    *s/ Elizabeth Kiss*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28