IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher Russett, et al., | No. CV-16-00431-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| State of Arizona, et al., | |
| Defendants. | |

Plaintiffs are corrections officers who allege they were injured as a result of decisions by Defendants, who are corrections department officials. After the Court dismissed some of the Plaintiffs' § 1983 claims, Plaintiffs filed a Second Amended Complaint, and Defendants again moved to dismiss. Some, but not all, of Plaintiffs' amended allegations survive the motion because Plaintiffs sufficiently allege they could have been foreseeably harmed by Defendants affirmatively placing them in dangerous situations, and that Defendants acted with deliberate indifference to that danger. Thus, Defendants' motion will be granted in part and denied in part.

**BACKGROUND**

Plaintiffs allege they were injured due to various unsafe corrections practices within the Arizona Department of Corrections. (Doc. 14; 56). In both the First and Second Amended Complaint, Plaintiffs allege routine staff shortages leave corrections officers vulnerable to violent inmate attacks and prevent corrections officers from responding to those attacks in a timely manner. Six plaintiffs also allege superiors

routinely failed to repair malfunctioning or broken cell doors or failed to maintain other equipment, allowing inmates to open their cell doors at will and attack corrections officers. At least four plaintiffs also allege violent and mentally-ill inmates were permitted to remain unrestrained or among the general population, or that corrections officers were not warned of inmate threats or given adequate training. Plaintiffs allege certain corrections personnel affirmatively put Plaintiffs in situations knowing that, combined with the dangerous conditions outlined above, inmates could viciously attack Plaintiffs.

Plaintiffs' First Amended Complaint asserted eleven counts. (Doc. 14). In brief, the first nine counts alleged 42 U.S.C. § 1983 claims against individual defendants, the tenth requested injunctive relief, and the eleventh alleged a § 1983 claim against the State of Arizona and Arizona Department of Corrections Director Charles Ryan in a representative capacity. (*Id.*). Defendants moved to dismiss. (Doc. 43). Defendants' motion was granted in part and denied in part. (Doc. 53). Of the first nine counts, the § 1983 claims against the individual defendants, Counts One, Three, Four, and Six were dismissed in their entirety. (*Id.*). Count Two was dismissed only as against Defendants Moody and Ramirez. (*Id.*). The Court also dismissed Count Ten, for injunctive relief, and Count Eleven, the § 1983 claim against the State of Arizona and Director Ryan in a representative capacity. (*Id.*). The Court allowed Count Two to proceed against Defendant Pizanno, and Counts Five, Seven, Eight, and Nine to proceed in full.[1] (*Id.*). In allowing those claims to proceed, the Court decided the individual defendants could not be dismissed on qualified immunity grounds.

Following the Court's order denying qualified immunity and permitting Plaintiffs to proceed on some claims, Defendants appealed. (Doc. 54). However, Plaintiffs filed a Second Amended Complaint amending the previously dismissed claims in Counts One,

---

[1] In doing so, Plaintiffs proceeded against Defendants Schroeder, Hensley, Pacheco, and Doe Defendants (Count Five), Defendants Escapule, Sanders, Carol, Pyle, and Doe Defendants (Count Seven), Defendants Ramos, McAdorey, and Doe Defendants (Count Eight), and Defendants Ramos, Pacheco, and Doe Defendants (Count Nine).

Two (against Defendants Moody and Ramirez), Three, Four, and Six. (Doc. 56). Defendants moved to dismiss the amended claims. (Doc. 60). The Parties agreed to stay the appeal pending this Court's decision on Defendants' latest motion to dismiss. (Doc. 59). Plaintiffs responded to the motion to dismiss, (Doc. 63), and Defendants replied, (Doc. 66).

## ANALYSIS

To survive a motion to dismiss for failure to state a claim, a complaint must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); Fed. R. of Civ. P. 8(a)(2). The complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009). This requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). Thus, when evaluating a motion to dismiss, a court accepts all factual allegations as true and draws all reasonable inferences therefrom, but need not accept legal conclusions. *See Twombly*, 550 U.S. at 555; *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2009); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296–98 (9th Cir. 1998).

Defendants' motion to dismiss argues all of the amended claims should be dismissed because the remaining Defendants are entitled to qualified immunity. An official sued under § 1983 is entitled to qualified immunity unless, after taking the facts in the light most favorable to the party asserting the injury, it appears (1) "the official violated a statutory or constitutional right" and (2) that right was "clearly established at the time of the challenged conduct." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014); *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004). Plaintiffs' ability to satisfy these

requirements varies as to each claim.

## I. Plaintiffs' Alleged Constitutional Violation

The Court will first address whether Plaintiffs have alleged a violation of a constitutional right. An individual does not have a constitutional right to state-provided protection from private harm. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006). But a state actor may not affirmatively place an individual in harm's way. *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971–72 (9th Cir. 2011) (citations omitted). If they do, it can violate that individual's constitutional rights. Specifically, a state actor violates an individual's constitutional rights if the actor (1) affirmatively places the individual in a more dangerous situation, (2) with deliberate indifference to a "known or obvious danger," and (3) the individual is foreseeably harmed as a result of that danger. *Id.*; *Kennedy*, 439 F.3d at 1062–64; *Pauluk v. Savage*, 836 F.3d 1117, 1124–25 (9th Cir. 2016).

Determining whether the state placed an individual in harm's way is comparatively straightforward when the state actor is interacting with a member of the general public. For example, the Ninth Circuit held police officers could be liable for the hypothermia death of an intoxicated, lightly dressed man because they ejected him from a bar in Montana, prevented him from re-entering the bar or entering his truck, and then left him outside on a bitterly cold night. *Munger v. City of Glasgow Police Department*, 227 F.3d 1082, 1084–90 (9th Cir. 2000). Likewise, the Ninth Circuit concluded police officers could be liable for the death of a seriously ill man because, after finding the man in distress on his front porch, they cancelled the existing request for medical assistance, broke down the lock on the man's front door, placed him inside the house, locked the door, and left him. *Penilla v. City of Huntington Park*, 115 F.3d 707, 708–11 (9th Cir. 1997). And the Ninth Circuit also concluded a police officer could be liable for a third-party's rape of a woman because the officer ejected the woman from the safety of a vehicle, impounded the car and arrested the vehicle's driver, and then deserted the woman in a high crime area. *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989). In each

case, the state actors placed the individual in an obviously more dangerous position than the one in which the individual was found, were deliberately indifferent to that danger, and the individual suffered a foreseeable injury.

Determining whether a state actor placed an individual in danger becomes more nuanced, however, when the individual is a state employee and the danger is present in the employee's workplace. That is because the state is not liable for simply failing to provide employees with safe work environments. *Collins v. City of Harker Heights*, 503 U.S. 115 (1992). Thus, in *Collins*, the city government was not liable for failing to train employees or to warn them of dangerous conditions which allegedly caused a city sanitation employee to die of asphyxia after entering a manhole to unclog a sewer line. *Id.* The Court noted, however, that the plaintiff in *Collins* did not claim "the city or any of its agents deliberately harmed [the employee]" or even that the employee's supervisor "instructed [the employee] to go into the sewer when the supervisor knew or should have known" there was a significant risk the employee would be injured. *Id.* at 125.

Instead of alleging a generally unsafe work environment, a plaintiff injured in their state-workplace must show (1) the state actor affirmatively placed the plaintiff in a situation where the plaintiff was exposed to an actual, particularized danger, (2) the state actor was deliberately indifferent to that danger, and (3) the plaintiff was foreseeably harmed. *Pauluk*, 836 F.3d at 1124–25. Thus, the Ninth Circuit concluded an employee's supervisors could be liable for an employee's mold-related death because they transferred that employee to a facility plagued with toxic mold, knew of the mold, knew of the potential health problems associated with mold exposure, and attempted to conceal the amount of mold and its dangers. *Id*. Likewise, the Ninth Circuit also concluded a supervisor could be liable for the rape of a nurse at a custodial institution, because the supervisor assigned the nurse to work alone with "a violent sex offender" who had "an extraordinary history of unrepentant violence against women and girls" and who then "assaulted, battered, kidnapped and raped her." *See L.W. v. Grubbs*, 974 F.2d 119, 120–22 (9th Cir. 1992).

1 Regarding the second prong in particular, deliberate indifference, the plaintiff must allege a state official "disregarded a known or obvious consequence of his action." *See Patel*, 648 F.3d at 974. This is because deliberate indifference requires more than gross negligence; it requires the defendant know something is likely to happen but consciously ignored that risk. *L.W. v. Grubbs*, 92 F.3d 894, 898–900 (9th Cir. 1996); *see also Patel*, 648 F.3d at 974–75 (noting the state actor must recognize an immediate, unreasonable risk and intend to expose the plaintiff to the risk "without regard to the consequences to the plaintiff"). Moreover, if a plaintiff requesting damages alleges a state actor's failure to remedy an ongoing danger demonstrates that state actor's deliberate indifference, the plaintiff must also show the state actor had the resources to remedy the danger, but chose not to. *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (explaining that, when determining whether a state actor was deliberately indifferent, "[w]hat resources are available . . . define the spectrum of choices that officials had at their disposal").

Taken together, these decisions show that, in the present case, a defendant is not liable for simply permitting a corrections facility to operate despite understaffing, generally failing to repair locked doors, or failing to warn a corrections officer of another inmate's threat. Instead, a defendant is only liable for taking an affirmative action which places a plaintiff in harm's way, such as sending or assigning a corrections officer to work in an area they know is dangerous or directing a corrections officer to approach an inmate they know threatened corrections officers. And the defendant must act with deliberate indifference to the danger plaintiff faces, such as by having the ability to segregate or restrain an inmate, or having the resources to adequately staff the facility or repair its broken locks, but choosing not to. Finally, the plaintiff's resulting harm must be foreseeable. Each amended claim is analyzed against this backdrop.

**A.  Count One: Plaintiff Russett – Defendants Fizer, Morris, Curtis, and Smith**

Plaintiffs allege that, at some time between September 2013 and October 2014,

- 6 -

1  Defendant Fizer, ASPC-Florence's Warden, and Defendant Morris, ASPC-Florence's
2  Deputy Warden, changed the inmate restraint policies to allow inmates in ASPC-
3  Florence's Central Unit to leave their cells unrestrained.  Plaintiffs allege that, in October
4  2014, after the inmate restraint policies were already changed, Defendants Fizer and
5  Morris assigned Corrections Officer Christopher Russett ("Russett") to work in Central
6  Unit, knowing the inmates housed in Central Unit were violent, often mentally ill, and
7  unrestrained.  Plaintiffs also allege Defendant Curtis, then ASPC-Florence's Chief of
8  Security, and Defendant Smith, then ASPC-Florence's Shift Commander, specifically
9  assigned Russett to work the night shift.

10 Plaintiffs allege that, on December 8, 2014, after Russett finished his night shift,
11 someone asked Russett to work overtime, as Central Unit was understaffed.  Plaintiffs
12 allege Defendants Fizer, Morris, and Curtis knew such staffing shortages were routine,
13 but Defendants Fizer, Morris, Curtis, and Smith did not take any action to alleviate the
14 understaffing.  Plaintiffs also allege that, despite the understaffing, on December 8, 2014,
15 Defendants Fizer, Morris, Curtis, and Smith decided to operate Central Unit as normal—
16 allowing inmates to leave their cells unrestrained—although they could have chosen to
17 operate Central Unit in the "closed" manner, such that inmates could only leave their
18 cells when restrained and accompanied by a corrections officer.  Plaintiffs also allege
19 Defendants Fizer, Morris, Curtis, and Smith decided to operate Central Unit as normal
20 despite knowing operating the unit in this state, when accompanied by understaffing,
21 endangered corrections officers.

22 Plaintiffs further allege Defendants Fizer, Morris, Curtis, and Smith knew Inmate
23 Hilton was violent because, on at least two occasions within the prior six months, Inmate
24 Hilton had assaulted other corrections officers.  Plaintiffs allege Inmate Hilton should
25 have had a higher security level and not been housed at Central Unit, but Defendants
26 Curtis and Smith, and possibly also Defendants Fizer and Morris, overrode this
27 designation, allowed Inmate Hilton to remain in Central Unit, and further allowed Inmate
28

Hilton to remain unshackled.[2] Plaintiffs allege Defendants Fizer, Morris, Curtis, and Smith knew that allowing violent inmates to remain in Central Unit, when combined with understaffing, endangered corrections officers.

Finally, Plaintiffs allege that, on December 8, 2014, due to the aforementioned understaffing, Russett was one of only two corrections officers expected to watch, monitor, and control approximately 120 violent offenders—including Inmate Hilton—while moving them into their cells in a timely manner. Plaintiffs allege that, as Russett was monitoring the inmates, Inmate Hilton approached Russett from behind and began to hit, punch, and kick Russett. Plaintiffs allege the actions of Defendants Fizer, Morris, Curtis, and Smith gave Inmate Hilton the opportunity to attack Russett that would not have otherwise existed.

The Court previously held Plaintiffs' allegations were sufficient to establish deliberate indifference. (Doc. 53, 6:23–24). However, the Court also noted Plaintiffs failed to identify how each state official "acted to place" Russett in a more dangerous situation, including who overrode Hilton's security classification, who made the decision to change the inmate shackling policy, who assigned Russet to work in Central Unit upon his return, or who made other affirmative decisions which created a dangerous situation. (*Id.* at 6:24–7:8).

As to Defendants Fizer and Morris, Plaintiffs sufficiently addressed the inadequacies identified by the Court. Plaintiffs alleged Defendants Fizer and Morris specifically assigned Russett to work in Central Unit, though they knew it housed violent, sometimes mentally ill, unrestrained inmates, and routinely suffered from staffing shortages. Plaintiffs also allege Defendants Fizer and Morris subsequently: (1) changed

---

[2] Plaintiffs' Second Amended Complaint does not clearly identify who overrode Inmate Hilton's security classification. It first states "Inmate Hilton's security level was overridden by Defendants Curtis and/or Smith" but later states "Defendants Fizer, Morris, Curtis, and Smith . . . overrode the security classification for Inmate Hilton." (Doc. 56 ¶¶ 80, 86). Taking the complaint in the light most favorable to Plaintiffs, the Court construes it as alleging as a collective action taken by Defendants Fizer, Morris, Curtis, and Smith.

- 8 -

the inmate restraint policies to allow inmates to leave their cells without restraints, despite knowing Central Unit houses violent, mentally ill inmates; (2) decided to operate Central Unit as normal on the day of the attack, despite knowing the safety problems this caused when combined with understaffing; and (3) overrode Inmate Hilton's higher security designation. Plaintiffs' allegations are sufficient to establish a claim for a state-created-danger. *See, e.g.*, *Pauluk* (placing employee in facility knowing it had toxic mold).

Regarding Defendants Curtis and Smith, however, Plaintiffs merely allege Defendants Curtis and Smith decided to operate Central Unit as if safety problems did not exist, despite being understaffed, and overrode Inmate Hilton's higher security designation. But Plaintiffs allege nothing suggesting these Defendants affirmatively acted to place Russett in this dangerous situation. For example, Plaintiffs do not allege Defendants Curtis or Smith asked Russett to work overtime in Central Unit on December 8, 2014, despite knowing it was understaffed and potentially dangerous. Plaintiffs do not allege Defendants Curtis or Smith sent Russett to monitor the unrestrained inmates' movements, including Inmate Hilton, despite knowing Inmate Hilton previously attacked other corrections officers. And though Plaintiffs allege Defendants Curtis and Smith assigned Russett to work the night shift, in fact Russett was not injured while he worked the night shift, but while he worked overtime after completing his normal shift. Thus, as to Defendants Curtis and Smith, Plaintiffs allegations will be dismissed with leave to amend. To state viable claims against Curtis and Smith, Plaintiffs would need to allege specific facts establishing how Defendants Curtis and Smith placed Russett in the dangerous situation.

**B. Count Two: Plaintiff Holder – Defendants Moody and Ramirez**

Plaintiffs allege that on February 3, 2014, Plaintiff David Holder ("Holder") was accompanying a pill nurse who was distributing medication in ASPC-Lewis' Morey Unit when Inmate Ratliff began kicking, beating, and punching Holder. The Court previously permitted Plaintiffs to proceed on Count Two against Defendant Pizanno, the corrections

1  employee who opened Inmate Ratliff's cell door despite being ordered not to open it for
2  any reason.  Thus, this motion to dismiss pertains only to whether Plaintiffs' Second
3  Amended Complaint alleges sufficient facts to support claims against Defendant Moody,
4  ASPC-Lewis' Warden, and Defendant Ramirez, then Sergeant in ASPC-Lewis' Morey
5  Unit.

6  Regarding Defendant Moody, Plaintiffs allege he knew staffing shortages were routine and, on February 3, 2014, knew the Blue Yard in particular was understaffed. Plaintiffs further allege Defendant Moody knew many cell doors in Morey Unit, including Inmate Ratliff's door, were malfunctioning or broken, yet failed to repair the cell doors and continued housing inmates in these cells.  Similar to the analysis of these allegations in the previous order, they are insufficient because they do not allege sufficient facts showing Defendant Moody affirmatively placed Holder in a dangerous situation.  Nor do they establish Defendant Moody was deliberately indifferent.  Thus, Plaintiffs' claims against Defendant Moody will be dismissed with leave to amend. Should Plaintiffs choose to amend, Plaintiffs must explain how Defendant Moody acted to place Holder in a dangerous situation, such as whether Defendant Moody specifically assigned Plaintiff to ASPC-Lewis' Morey Unit.  Plaintiffs must also explain how Defendant Moody was deliberately indifferent, such as whether Defendant Moody knew of Inmate Ratliff's immediate threats, or whether there were resources to appropriately staff ASPC-Lewis' Morey Unit, repair the faulty doors, or house the inmates in cells with locking doors, and yet Defendant Moody chose to expose corrections officers to these unsafe conditions.

Turning to Defendant Ramirez, Plaintiffs allege that on February 3, 2014, Defendant Ramirez failed to segregate Inmate Ratliff, and then ordered Holder to accompany the pill nurse through the Red Yard and failed to warn Holder of Inmate Ratliff's previous threat to attack the next corrections officer he saw.  These allegations are sufficient to state a claim against Defendant Ramirez.  Defendant Ramirez allegedly affirmatively placed Holder in danger by ordering Holder to enter the Red Yard, where

1  Inmate Ratliff was. And Defendant Ramirez allegedly did so knowing Inmate Ratliff
2  intended to attack a corrections officer as soon as he had a chance, but disregarded that
3  risk by failing to warn Holder of Inmate Ratliff's threat. *Patel*, 648 F.3d at 975. Whether
4  Defendant Ramirez did not act with deliberate indifference because he also acted to
5  protect corrections officers, including Holder, by instructing Defendant Pizanno not to
6  open Inmate Ratliff's cell door for any reason, is a question of fact for the jury to
7  determine. *Patel*, 648 F.3d at 974 ("The deliberate-indifference inquiry should go to the
8  jury if any rational factfinder could find this requisite mental state."). Therefore,
9  Plaintiffs have stated a claim against Defendant Ramirez.

### C.  Count Three: Plaintiff Knighton – Defendants Lunka, Hibbard, and Moody

Plaintiff Desiree Knighton ("Knighton") alleges she was assigned to work in ASPC-Lewis' Morey Unit but, on March 6, 2014, was asked to work overtime at ASPC-Lewis' Eagle Point Unit to alleviate staffing shortages there. Plaintiffs allege that, when Knighton arrived at the Eagle Point Unit, she was originally assigned to work "program security." Plaintiffs allege Defendant Lunka, Eagle Point's Chief of Security, and Defendant Hibbard, Eagle Point's Deputy Warden, then reassigned Knighton to be the yard set officer.[3] Plaintiffs allege Knighton informed Defendant Lunka she did not know the yard or a yard set officer's duties, and Defendant Lunka failed to give Knighton any training or direction. Plaintiffs also allege Defendants Lunka and Hibbard knew: Inmate Braxton's nickname was "Psycho"; Inmate Braxton was a violent and troubled inmate; Inmate Braxton recently lost his job with Swift Transportation and was acting aggressively and erratically; Inmate Braxton recently tested positive for

---

[3] Plaintiffs' complaint is contradictory regarding who assigned Knighton to be the yard set officer. The complaint initially alleges "Lunka reassigned [Knighton] to be a 'Yard set' officer," (Doc. 56, ¶ 151), but later alleges "Defendant Hibbard, [and] Lunka still assigned her to work as a Yard set officer," (*Id.* at ¶ 171). Plaintiffs' Response to Defendants' Motion to Dismiss does not clarify this point. (Doc. 63 at 9:20, 10:15–17). However, taking the complaint in the light most favorable to Plaintiffs, the Court construes this action as one taken by Defendants Lunka and Hibbard.

- 11 -

1 methamphetamines and had stayed awake for the past two or three days; and Inmate
2 Braxton threatened to "take out a CO." Plaintiffs further allege Defendants Lunka and
3 Hibbard chose to operate the Eagle Point Unit with insufficient staff, failed to segregate
4 Inmate Braxton, failed to warn Knighton about him, and failed to train Knighton.
5 Plaintiffs allege that, as a result of these actions, while in Eagle Point's yard, Knighton
6 looked down at the list of inmates she needed to wake and, without warning, Inmate
7 Braxton approached Knighton and began beating her with a mesh bag of gravel and sharp
8 rocks, permanently depriving her of vision in her left eye and leaving her with other
9 serious injuries.

10 Plaintiffs' allegations are sufficient to state a claim against Defendants Lunka and
11 Hibbard, as they demonstrate Defendants Lunka and Hibbard affirmatively placed
12 Knighton in the yard, where Knighton was then exposed to the dangerous Inmate Braxton
13 and was in a worse position than she would otherwise have been had Knighton remained
14 in program security. Moreover, Defendants Lunka and Hibbard were deliberately
15 indifferent to a well-known and immediate danger existing in the yard, because they
16 knew Inmate Braxton was acting aggressively and had explicitly threatened to "take out a
17 CO." Further, knowing all this they failed to train Knighton. And despite this
18 knowledge, they still assigned Knighton to work in his proximity without giving her any
19 warning. *Grubbs*, 974 F.2d at 123 (finding deliberate indifference where state actor knew
20 an inmate was a violent sex offender likely to assault a woman but still assigned a nurse
21 to work alone with him); *see also Patel*, 648 F.3d at 975 (collecting and discussing
22 deliberate indifference cases). Thus, Plaintiffs have stated a claim against Defendants
23 Lunka and Hibbard.

24 Regarding Defendant Moody, however, Plaintiffs merely allege Defendant Moody
25 knew of and contributed to Eagle Point's unsecure and dangerous environment. Plaintiffs
26 do not allege the facts showing Defendant Moody knowingly acted to place Knighton in
27 this dangerous environment, or that Defendant Moody had the resources to correct the
28 staffing shortages. Therefore, Plaintiffs' allegations against Defendant Moody are

insufficient to state a state-created-danger claim, and will be dismissed.

### D.  Count Four: Plaintiff Schuster – Defendant Moody

Plaintiff Doug Schuster ("Schuster") worked as the Deputy Warden of ASPC Lewis' Morey Unit.  Plaintiffs allege the Morey Unit had been on lockdown for several days due to violent racial riots.  Plaintiffs allege that, on January 24, 2014, Defendant Moody decided to lift Morey Unit's lockdown and resume normal operations.  Plaintiffs allege Defendant Moody decided to resume normal operations despite knowing Morey Unit was severely understaffed and that racial tensions were ongoing.

Plaintiffs allege that, following Defendant Moody's order to end lockdown, Morey Unit staff found an anonymous note informing them that intense racial tension was ongoing.  Plaintiffs allege Schuster entered the recreation yard to discuss the racial tension with inmates and corrections officers, in advance of a meeting with Defendant Moody.  Plaintiffs allege that, while Schuster was in the yard, Inmate Salley viciously attacked him, causing bleeding on both sides of Schuster's brain.  Plaintiffs allege that additional officers normally would accompany Schuster into the yard, but were unable to do so because Morey Unit was understaffed.

Plaintiffs' allegations are insufficient to state a claim.  Although Defendant Moody decided to lift the lockdown, despite ongoing racial tensions and understaffing, Defendant Moody's decision appears to be factually unrelated to Schuster's presence in the yard.  Plaintiffs do not allege the anonymous note was reported to Defendant Moody, or that Defendant Moody ordered Schuster to go into the yard.  Instead, it appears from the complaint that Schuster voluntarily went to the yard to collect information regarding the ongoing racial tensions.  Alternatively, Plaintiffs do not allege it was Defendant Moody who assigned Schuster to work in the Morey Unit, knowing it was chronically understaffed and dangerous.  Nor do Plaintiffs allege Defendant Moody assigned Schuster to work in the Morey Unit on the day of the attack, knowing Defendant Moody would lift the lockdown despite the understaffing and ongoing racial tensions.  In short, Plaintiffs do not allege exactly how Defendant Moody affirmatively placed Schuster in

this dangerous environment.

As a separate avenue of possible liability, Plaintiffs also allege that, when Schuster returned to work shortly after Inmate Salley's attack, Schuster provided MRIs to Defendant Moody which showed bleeding in both sides of Schuster's brain. Two days later, another inmate disturbance occurred on the yard, and Plaintiffs allege Defendant Moody ordered Schuster to go "quell the disturbance." While Schuster responded, another corrections officer threw a flash-bang grenade that landed at Schuster's feet. This caused Schuster to experience an intense pain and a debilitating headache. However, Plaintiffs fail to allege facts establishing that when Defendant Moody sent Schuster to quell the second inmate disturbance it was foreseeable Schuster could be injured by another corrections officer's flash bang grenade. Thus, Plaintiffs' allegation against Defendant Moody will be dismissed with leave to amend.

**E.   Count Six: Plaintiff Salazar – Defendants Ramos, Josefowicz, Ritchie, Schroeder, and Stemple**

On October 22, 2015, due to staffing shortages, Plaintiff Armando Salazar ("Salazar") was reassigned from his usual role in the Special Security Unit to the main control room of ASPC-Tucson's Cimarron Unit. Plaintiffs allege the cell doors in Cimarron Unit were defective such that inmates housed there could voluntarily open some cell doors. Salazar was unfamiliar with the Cimarron Unit, and was not told, nor did he independently know, the cell doors were defective. Plaintiffs allege Defendant Ramos was ASPC-Tucson's Warden, Defendant Josefowicz was ASPC-Tucson's Assistant Deputy Warden, and Defendant Ritchie was Cimarron Unit's Chief of Security.[4]  Plaintiffs allege Defendants Ramos, Josefowicz, and Ritchie knew Cimarron

---

[4] The factual allegations section of Plaintiff Salazar's claim only mentions Defendants Ramos, Josefowicz, and Ritchie. (Doc. 56, 28:23–32:6). However, in Count Six of the Claims for Relief section, Plaintiffs allege Salazar asserts claims against Defendants Josefowicz and Ritchie, but not Defendant Ramos. (Doc. 56, 49:17). This section also states Plaintiff Salazar asserts claims against previously unmentioned Defendants Schroeder and Stemple. (*Id.*). First, regarding Defendants Ramos and Schroeder, Plaintiffs' Claims for Relief section appears to confuse Defendant Ramos,

- 14 -

Unit inmates could voluntarily open their locked cell doors, housed violent Mexican Mafia gang members in cells with faulty locks, and continued to operate the unit in this condition despite the faulty locks. Plaintiffs further allege these Defendants failed to replace or repair the defective locks and failed to warn corrections officers of the danger the defective locks posed.

Plaintiffs allege that, on October 22, 2015, a Mexican Mafia gang member attacked another inmate, creating extreme racial tension in the Cimarron Unit. Plaintiffs allege the Cimarron inmates were placed on "lock-down," which required they be locked in their cells. After Salazar arrived at Cimarron Unit, Plaintiffs allege Defendant Ramos ordered Salazar to leave the main control post, get a Mexican Mafia gang member from his cell, and bring the Mexican Mafia gang member to another building for an interview. Salazar then went to Defendant Josefowicz to confirm the duty change. Defendant Josefowicz authorized it. Defendant Ritchie was present during this conversation and volunteered to accompany and assist Salazar, but, upon reaching the Cimarron Unit door, remained outside to smoke a cigarette. When Salazar, now unaccompanied, opened the Mexican Mafia inmate's cell door, the inmate assaulted him. Other officers responded, but, just as they began to control the situation, ten other inmates—all Mexican Mafia members—started opening their faulty cell doors and joined the attack. Salazar was left severely injured.

Plaintiffs' allegations against Defendants Ramos and Josefowicz are sufficient to state a claim. Defendants Ramos and Josefowicz were sufficiently involved in the

---

who Plaintiffs allege was ASPC-Tucson's Warden at the time of Salazar's injury, (Count Six), with Defendant Schroeder, who Plaintiffs allege was ASPC-Tucson's Warden at the time of Tim Baca's injury, (Count Five). Second, regarding Defendant Stemple, Plaintiffs' First Amended Complaint included allegations against Defendant Stemple, which Plaintiffs appear to have removed from their Second Amended Complaint. Thus, Plaintiffs likely merely failed to delete Defendant Stemple's name from the Second Amended Complaint's Claims for Relief section. Regardless, because Plaintiffs' complaint does not include any factual allegations against Defendants Schroeder and Stemple sufficient for Plaintiff Salazar to state a claim against them, both Defendants Schroeder and Stemple will be dismissed.

1   decision to send Salazar to the Mexican Mafia member's cell.  Moreover, despite
2   knowing of the ongoing tension amongst the Mexican Mafia members and that some
3   allegedly "locked down" inmates—including other Mexican Mafia inmates—housed in
4   that unit could voluntarily open their cell doors and attack corrections officers at will,
5   they did not make any effort to warn or protect Salazar.

6   Plaintiffs' allegations are also sufficient to demonstrate Defendant Ritchie was
7   deliberately indifferent.  Defendant Ritchie knew Salazar was entering an area where
8   agitated, Mexican Mafia inmates were allegedly "locked" inside cells with faulty locks.
9   Defendant Ritchie also agreed to "help" Salazar, but then remained outside to smoke a
10  cigarette without warning Salazar of the danger he faced.  *See Patel*, 648 F.3d at 975
11  (explaining that, in holding a teacher was not deliberately indifferent, "[t]his would be a
12  different case" if the special education teacher had known the developmentally disabled
13  student was about to enter the bathroom with a high school student who had engaged in
14  sexual relations with her, yet then "stood idly by").  However, Plaintiffs have failed to
15  allege how Defendant Ritchie affirmatively acted to place Salazar in harm's way.  Should
16  Plaintiffs wish to amend again, they would need to allege sufficient facts showing how
17  Defendant Ritchie affirmatively placed Salazar at the scene of attack.

18  **II.     Clearly Established Constitutional Violation**

19  This Court previously concluded that Ninth Circuit case law sufficiently notified
20  these Defendants that knowingly sending corrections employees into situations where
21  they would encounter violent inmates and be exposed to inmate assault, without warning
22  them of known dangers such as broken cell doors, inmate threats, or violent inmate
23  tendencies, violated clearly established law.  However, because Defendants again
24  challenge this Court's ruling, the Court will briefly revisit the issue.

25  Clearly established law is not defined "at a high level of generalization." *Ashcroft*
26  *v. al-Kidd*, 563 U.S. 731, 741–42 (2011); *see also Reichle v. Howards*, 566 U.S. 658, 665
27  (2012).  Instead, the right allegedly violated must be established "in a 'particularized'
28  sense so that the 'contours' of the right are clear to a reasonable official." *Reichle v.*

- 16 -

*Howards*, 566 U.S. at 665 (citation omitted); *see also Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

Still, a case directly on point is not required. *Hope*, 536 U.S. at 739 ("[O]fficials can be on notice that their conduct violates established law even in novel factual situations"); *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1136–37 (9th Cir. 2003) ("In order to find that the law was clearly established . . . we need not find a prior case with identical, or even 'materially similar' facts."). A court must simply identify a case where a defendant, acting under "similar circumstances," violated the same constitutional right. *White v. Pauly*, 137 S. Ct. 548, 552 (2017).

The Ninth Circuit has long held state officials liable in a variety of circumstances for their roles in creating or exposing individuals to danger they otherwise would not have faced. *See Grubbs*, 974 F.2d at 123; *Penilla*, 115 F.3d at 711; *Munger*, 227 F.3d at 1090. Of these, *Grubbs* is the most factually analogous case. There, the Ninth Circuit specifically held that defendants who assigned a nurse to work alone with a violent sex offender and misrepresented the work's risks created the opportunity for one inmate to assault, rape, and kidnap the nurse. *Grubbs*, 974 F.2d at 121–23. Defendants argue these facts are too dissimilar to place Defendants on notice their conduct violated a clearly-established right. However, identical facts are not required. As this Court previously explained, *Grubbs* sufficiently notified the individual Defendants that sending corrections employees to situations where they would encounter violent inmates and be exposed to inmate assault, without warning them of known dangers such as of broken cell doors or violent inmate tendencies, violated clearly established law.

Defendants' other arguments are similarly unpersuasive. Defendants argue "every," not just "a," reasonable official must understand their actions violate a constitutional right. But even in the cases Defendants cite, the Supreme Court has articulated both iterations. *See, e.g.*, *Reichle*, 566 U.S. at 664–65 (noting that, "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right," and explaining that "we have

- 17 -

previously explained that the right allegedly violated must be established . . . so that the 'contours' of the right are clear to a reasonable official"). Semantics aside, what is plain is that qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al–Kidd*, 563 U.S. at 743. And, following *Grubbs*, reasonable officials should have understood Defendants' conduct violated the law.

Finally, Defendants also argue the "violation must have been clearly established by Supreme Court precedent, not one circuit's precedent." This argument misreads the Supreme Court's holdings. None of the cases Defendants cite reach that conclusion. In fact, contrary to Defendants' interpretation, these cases assume without deciding that controlling circuit precedent—and potentially even a "robust consensus of cases of persuasive authority"—*could* clearly establish a constitutional right. *See, e.g.*, *Taylor v. Barkes*, 135 S. Ct. 2042, 2045 (2015) (assuming "a right can be 'clearly established' by circuit precedent despite disagreement in the courts of appeals"); *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1778 (2015) (assuming a right could be clearly established by circuit precedent, or even by a "robust consensus of cases of persuasive authority"); *Reichle*, 566 U.S. at 665–66 (assuming a right could be clearly established by controlling circuit authority); *Ryburn v. Huff*, 565 U.S. 469, 474 (2012) (not addressing whether a right could be clearly established by circuit precedent); *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (assuming a right could be clearly established by controlling circuit precedent). And, though the Supreme Court has not resolved this question, the Ninth Circuit has held that circuit authority can clearly establish a constitutional right. *Entler v. Gregoire*, 872 F.3d 1031, 1041 (9th Cir. 2017). For these reasons, the Court repeats its prior holding that Defendants' actions violated clearly established law.

### III. Leave to Amend

The Court recognizes this case is currently stayed on appeal, and the outcome of the appeal will likely resolve the future of this case. The Court also recognizes Plaintiffs

1  were previously given one opportunity to amend their claims.  (Doc. 53).  However, in
2  dismissing for failure to state a claim under Rule 12(b)(6), a district court must grant
3  leave to amend "unless it determines that the pleading could not possibly be cured by the
4  allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (citations
5  omitted) (concluding the court abused its discretion in denying plaintiff a second
6  opportunity to amend his pleading to cure its deficiencies).  Here, the deficiencies
7  identified may be curable.  Thus, Plaintiffs must be granted an opportunity to amend.
8  Accordingly,

9  **IT IS ORDERED** Defendants' Motion to Dismiss, (Doc. 60), is **GRANTED IN
10 PART AND DENIED IN PART**.  The motion to dismiss is **DENIED** as to Defendants
11 Fizer and Morris in Count One, Defendant Ramirez in Count Two, Defendants Lunka
12 and Hibbard in Count Three, and Defendants Ramos and Josefowicz in Count Six.  The
13 motion to dismiss is **GRANTED** as to Defendants Curtis and Smith in Count One,
14 Defendants Moody in Count Two, Defendant Moody in Count Three, Defendant Moody
15 in Count Four, and Defendants Ritchie, Schroeder, and Stemple in Count Six.

16 **IT IS FURTHER ORDERED** if Plaintiffs can cure the Second Amended
17 Complaint's deficiencies, they shall file a Third Amended Complaint no later than
18 March 2, 2018.  Plaintiffs are instructed to remove all references to Defendants against
19 whom they are no longer asserting claims, (Doc. 56, 4:3-8:22), and to clarify areas of
20 contradiction noted in this Court's order.

21 **IT IS FURTHER ORDERED** that, if Plaintiffs do not file a Third Amended
22 Complaint by March 2, 2018, the Clerk of Court shall dismiss Defendants Curtis and
23 Smith in Count One, Defendant Moody in Count Two, Defendant Moody in Count Three,
24 Defendant Moody in Count Four, and Defendants Ritchie and Stemple in Count Six.

25 Dated this 13th day of February, 2018.

Honorable Roslyn O. Silver
Senior United States District Judge